# ATCHISON, TOPEKA & SANTA FE RAILWAY CO. ET AL. *v.* WICHITA BOARD OF TRADE ET AL.

No. 72–214. Argued February 28, 1973—Decided June 18, 1973*

*Together with No. 72–433, *Interstate Commerce Commission* v. *Wichita Board of Trade et al.*, also on appeal from the same court.

MARSHALL, J., announced the Court's judgment and delivered an opinion, in which BURGER, C. J., and STEWART and BLACKMUN, JJ., joined. DOUGLAS, J., filed an opinion concurring in the affirmance of the remand to the ICC and dissenting from the reversal of the decree authorizing the injunction, *post*, p. 826. WHITE, J., filed an opinion concurring in the reversal of the injunction and dissenting from the affirmance of the remand to the ICC, in which BRENNAN and REHNQUIST, JJ., joined, *post*, p. 828. POWELL, J., took no part in the consideration or decision of the cases.

*Earl E. Pollock* argued the cause for appellants in No. 72–214. With him on the briefs were *William F. Cottrell* and *Christopher A. Mills. Betty Jo Christian* argued the cause for appellant in No. 72–433. With her on the briefs were *Fritz R. Kahn* and *Hanford O'Hara.*

*Daniel J. Sweeney* argued the cause for Wichita Board of Trade et al., appellees in both cases. With him on the brief was *Harold E. Spencer. William A. Imhof* argued the cause for the Secretary of Agriculture. With him on the brief were *John A. Knebel, Harold M. Carter,* and *Kenneth H. Vail.*

*Solicitor General Griswold, Assistant Attorney General Kauper, Keith A. Jones,* and *Howard E. Shapiro* filed a memorandum for the United States.

MR. JUSTICE MARSHALL announced the judgment of the Court, and an opinion in which THE CHIEF JUSTICE, MR. JUSTICE STEWART, and MR. JUSTICE BLACKMUN join.

We noted probable jurisdiction in these cases to resolve two important questions relating to the proper role of courts in reviewing approval by the Interstate Commerce Commission of proposed rate increases by railroads. 409 U. S. 1005 (1972). First, under what circumstances may a reviewing court find that the Commission has failed adequately to explain its apparent departure from settled Commission precedent? Because the problem of determining what policies an agency is following, as a prelude to determining whether the agency is acting in accordance with Congress' will, is a recurring one, this issue raises general problems of judicial review of agency action. The second question in these cases is a more limited one: in order to enjoin a proposed rate increase after a final order by the Interstate Commerce Commission, what sort of error must a District Court find in the proceedings of the Commission? We hold that in these cases the Commission did not explain its apparent departure from precedent in a manner sufficient to permit judicial review of its policies, but that, nevertheless, that kind of error does not justify the District Court in entering an injunction against imposition of the rates pending review of the Commission's action on remand. We therefore vacate the judgment of the District Court and remand for the entry of a proper order.[1]

[1] We have previously stayed the judgment of the District Court on condition that appellant railroads keep accounts of the amounts received from the in-transit charges. 409 U. S. 801 (1972). We hereby direct the District Court to. enter an order, consistent with this opinion, regarding the disposition of those amounts.

I

In these cases, the railroads proposed to establish a separate charge for inspection of grain while in transit.[2] In order to inspect the grain, the railroad cars loaded with it are stopped and placed on track facilities. A sample of the grain is taken, and the official grade is determined. Once the grade is known and the commercial value of the grain established, the shipper orders the car to proceed to the appropriate market. In-transit inspections have substantial advantages to shippers over inspection at the destination. If the grain were to be found to be of a different grade than expected only after arrival at the destination, sending it to another market might be quite expensive. The advantages of in-transit inspections to purchasers, instead of inspection at the source that might satisfy shippers, are less marked but are nonetheless significant. The grain might deteriorate while in transit, thus leaving the purchaser with grain of a lower quality than he expected. And the possibility of bias of the inspector is greater if the inspection is made at the source.

The Commission found that "the orderly marketing of grain under present practices requires that a substantial portion of the commodity moving in commercial

---

[2] Such a charge is already made for the first in-transit inspection in the eastern territory. The proposed rates would increase that charge from $7.42 to $14.33. There would be a slight increase in the currently effective charge for the second and subsequent inspections. A large majority of the number of in-transit inspections occur in the western territory, where most of this country's grain is produced and where no separate charge is now made for the first in-transit inspection. Only a few cars are stopped for more than one inspection. Thus, for convenience of exposition, we treat this litigation as involving a proposal for a separate new charge; that is the real effect of the railroads' proposal in most instances.

channels must be subjected to some form of sampling and inspection to determine grade or quality." 339 I. C. C. 364, 385 (1971).[3] However, it also found that this sampling need not take place while the grain is in transit. The practice of in-transit inspections developed when federal law required inspections for the purpose of grading. 39 Stat. 483. But the diversion of grain from railroads to motor trucks made it difficult to enforce the inspection requirements. When trucks are used, in-transit inspections are not generally made. Thus, in order to simplify the movement of grain, Congress abolished the requirement of inspections. Pub. L. 90–487, 82 Stat. 761. In addition, the convenience of sampling at the source of the grain has increased with the widening reliance on low-cost mechanical samplers installed at grain elevators. The Commission therefore concluded that in-transit inspections were not necessary for the orderly marketing of grain.

It also concluded that in-transit inspections resulted in a substantial decrease in the number of freight cars available for general use.[4] Relying on a variety of studies conducted by the railroads, the Commission found that each inspection kept a freight car out of use for roughly three days, and that the cumulative impact of the delays due to in-transit inspection was to reduce the available freight car fleet by several thousand cars.

Finally, the Commission considered whether the proposed separate charge for each in-transit inspection fairly reflected the cost to the railroad of such an inspection. Again, it relied on quite detailed studies that established

---

[3] The report of Division 2 of the Commission is found at 339 I. C. C. 364 (1971). The entire Commission "adopt[ed] and affirm[ed] the findings and conclusions reached" in that report. 340 I. C. C. 69, 70 (1971).

[4] For a description of the car-utilization problem, see *United States v. Allegheny-Ludlum Steel Corp.*, 406 U. S. 742, 745–746 (1972).

the cost of detaining a car, the cost of switching it on and off the main line, and the clerical costs of conducting inspections. The Commission concluded that the proposed charges were "not excessive in amount . . . on the basis of the convincing evidence of record showing the costs sustained by the railroads in performing the in-transit inspection service." 340 I. C. C., at 71–72.

Shippers who had objected to the proposed new charges before the Commission sought review of the Commission's order, and a statutory three-judge District Court was convened. The District Court found that these conclusions were supported by substantial evidence, and they are not challenged here. But the District Court held that the Commission had not adequately justified its failure to follow "its long established rule that it will not allow a separate charge for an accessorial service previously performed as part of the line-haul rates without substantial evidence that such an additional charge is justified measured against the overall services rendered and the overall reasonableness of the increased line-haul rate resulting therefrom." 352 F. Supp. 365, 368. The Commission, although it analyzed the cost of each in-transit inspection, had made no attempt to consider the reasonableness of continuing the existing line-haul rate, which included some charge for in-transit inspections. Instead, the Commission had attempted to distinguish this case from prior cases in which the rule was invoked, but the District Court, relying on *Secretary of Agriculture* v. *United States*, 347 U. S. 645 (1954), was "not convinced that the instant proceeding can be 'distinguished' as the Commission has indicated." 352 F. Supp., at 369.

Although the Commission must be given some leeway to re-examine and reinterpret its prior holdings, it is not sufficiently clear from its opinion that it has done so in this case. A reviewing court must be able to discern in the Commission's actions the policy it is now pur-

suing, so that it may complete the task of judicial review—in this regard, to determine whether the Commission's policies are consistent with its mandate from Congress. Since we cannot tell from the Commission's opinions what those policies are, we therefore agree with the District Court that the Commission's order finding the rates just and reasonable cannot be sustained.

## II

Judicial review of decisions by the Interstate Commerce Commission in rate cases necessarily has a limited scope. Such decisions "are not to be disturbed by the courts except upon a showing that they are unsupported by evidence, were made without a hearing, exceed constitutional limits, or for some other reason amount to an abuse of power." *Manufacturers R. Co.* v. *United States,* 246 U. S. 457, 481 (1918).[5] As this Court has observed, "The process of rate making is essentially empiric. The stuff of the process is fluid and changing—the resultant of factors that must be valued as well as weighed. Congress has therefore delegated the enforcement of transportation policy to a permanent expert body and has charged it with the duty of being responsive to the dynamic character of transportation problems." *Board of Trade of Kansas City* v. *United States,* 314 U. S. 534, 546 (1942).

The delegation to the Commission is not, of course, unbounded, and it is the duty of a reviewing court to determine whether the course followed by the Commission is consistent with its mandate from Congress. See *ICC* v. *Inland Waterways Corp.,* 319 U. S. 671, 691 (1943); *Burlington Truck Lines, Inc.* v. *United States,* 371 U. S. 156, 167–169 (1962). Cf. *NLRB* v. *Wyman-Gordon Co.,* 394 U. S. 759, 767 (1969) (opinion of Fortas,

---

[5] See also 5 U. S. C. § 706 (2).

J.). But a simple examination of the order being reviewed is frequently insufficient to reveal the policies that the Commission is pursuing. Thus, this Court has relied on the "simple but fundamental rule of administrative law," *SEC* v. *Chenery Corp.*, 332 U. S. 194, 196 (1947), that the agency must set forth clearly the grounds on which it acted. For "[w]e must know what a decision means before the duty becomes ours to say whether it is right or wrong." *United States* v. *Chicago, M., St. P. & P. R. Co.*, 294 U. S. 499, 511 (1935). See also *Phelps Dodge Corp.* v. *NLRB*, 313 U. S. 177, 197 (1941); *SEC* v. *Chenery Corp.*, 318 U. S. 80, 94 (1943). And we must rely on the rationale adopted by the agency if we are to guarantee the integrity of the administrative process. *Id.*, at 88. Cf. *NLRB* v. *Metropolitan Life Ins. Co.*, 380 U. S. 438, 443–444 (1965). Only in that way may we "guard against the danger of sliding unconsciously from the narrow confines of law into the more spacious domain of policy." *Phelps Dodge Corp.* v. *NLRB, supra,* at 194.

An agency "may articulate the basis of its order by reference to other decisions," *NLRB* v. *Metropolitan Life Ins. Co., supra,* at 443 n. 6. For "[a]djudicated cases may and do, of course, serve as vehicles for the formulation of agency policies, which are applied and announced therein. See H. Friendly, The Federal Administrative Agencies 36–52 (1962). They generally provide a guide to action that the agency may be expected to take in future cases. Subject to the qualified role of *stare decisis* in the administrative process, they may serve as precedents." *NLRB* v. *Wyman-Gordon Co., supra,* at 765–766 (opinion of Fortas, J.). This is essentially a corollary of the general rule requiring that the agency explain the policies underlying its action. A settled course of behavior embodies the agency's informed judgment that, by pursuing that course, it will carry out the policies committed to it by Congress.

There is, then, at least a presumption that those policies will be carried out best if the settled rule is adhered to. From this presumption flows the agency's duty to explain its departure from prior norms. *Secretary of Agriculture v. United States, supra,* at 653. The agency may flatly repudiate those norms, deciding, for example, that changed circumstances mean that they are no longer required in order to effectuate congressional policy. Or it may narrow the zone in which some rule will be applied, because it appears that a more discriminating invocation of the rule will best serve congressional policy. Or it may find that, although the rule in general serves useful purposes, peculiarities of the case before it suggest that the rule not be applied in that case. Whatever the ground for the departure from prior norms, however, it must be clearly set forth so that the reviewing court may understand the basis of the agency's action and so may judge the consistency of that action with the agency's mandate.

A further complication arises when, as here, the agency distinguishes earlier cases in which it invoked the rule. An initial step, and often the only one clearly taken, is to specify factual differences between the cases. Those factual differences serve to distinguish the cases only when some legislative policy makes the differences relevant to determining the proper scope of the prior rule. It is all too easy for a court to judge the adequacy of an asserted distinction in light of the policies the court, rather than the agency, seeks to implement; that is, after all, what an appellate court does with respect to courts of the first instance. Yet when an agency's distinction of its prior cases is found inadequate, the reviewing court may inadvertently adopt the stance it ordinarily takes with respect to other courts, and thereby may invade "the domain which Congress has set aside exclusively for the administrative agency," *SEC* v. *Chen-*

*ery Corp., supra,* at 196, that is, the choice of particular actions to carry out the broad policies stated by Congress. Instead, it is enough to satisfy the requirements of judicial oversight of administrative action if the agency asserts distinctions that, when fairly and sympathetically read in the context of the entire opinion of the agency, reveal the policies it is pursuing. So long as the policies can be discerned, the court may exercise its proper function of determining whether the agency's policies are consistent with congressional directives.

These principles gain content when applied to the present cases. The District Court held that the Commission had not repudiated or adequately distinguished its prior cases establishing the rule that "it will not allow a separate charge for an accessorial service previously performed as part of the line-haul rates without substantial evidence that such an additional charge is justified measured against the overall services rendered and the overall reasonableness of the increased line-haul rate resulting therefrom." 352 F. Supp., at 368. While this is a fair summary of the Commission's established practice,[6] it conceals

---

[6] In *Transit Charges, Southern Territory,* 332 I. C. C. 664, 683 (1968), the Commission stated the rule in these terms: "[T]he proposed charge may not be divorced from the line-haul rate, for both, insofar as transit is concerned, are inextricably interdependent. [Citations omitted.] While it would seem preferable to have the various elements entering into, and constituting, the whole analyzed, if indeed they could be separated, the entire transportation service rendered, including transit, must be examined in relation to the total rates and charges assessed." The District Court reviewing that case rephrased the rule: "The question here is what should the carrier be paid for a service which it has been rendering, and has been charging for, and has been paid for (one knoweth not what) which it proposes to separate and charge separately for. Both the courts and the Commission have consistently held that what is a just and reasonable rate for the service to be separated and charged for separately cannot be determined by examining only the typical

the apparent purpose of the rule, to protect two distinct classes: shippers who will continue to utilize the accessorial service—in this case, those who will still have their grain inspected while in transit—and shippers who will not. To decide whether the Commission has adequately explained its failure to follow that rule, we must consider each class in turn, for the Commission may have made clear why it need not protect one class by invoking the rule but it may nonetheless have failed to say why it need not protect the other class.

In *Unloading Lumber to New York Harbor,* 256 I. C. C. 463 (1943), the Commission dealt with a proposal to charge separately for unloading, a service that was inextricably bound up with the line-haul service. Cf. *Secretary of Agriculture* v. *United States, supra,* at 648–649. The Commission said, "It follows that respondents may not now segregate a component of that [line-haul] service, making a separate charge therefor, without an

---

questions of cost, etc., with respect to the separate service. On the contrary, the typical questions must be directed to the overall or combined picture so that one may conclude (a) that the rate for the separated service, looked at by itself in the light of the applicable questions, is just and reasonable; and (b) that the remaining rate for the services, sans the separated service, is not rendered unjust or unreasonable." *Cincinnati, N. O. & T. P. R. Co.* v. *United States,* Civil Action No. 6992 (SD Ohio, Jan. 12, 1970), aff'd, 400 U. S. 932 (1970). The District Court continued, somewhat more obscurely: "Whether the examination is in terms of 'what portion of the line-haul rate represented the rate for the service to be separated,' or whether the search in terminology is for the answer to this question: Does the new aggregate rate, composed of line-haul plus transit rates represent a just and reasonable rate for all of the services (the aggregate of the severed and the non-severed)—the principle is the same." And in *Secretary of Agriculture* v. *United States,* 347 U. S. 645, 654 (1954), this Court referred to it as "the prevailing rule . . . that a service necessarily encompassed by the line-haul rate cannot be separately restated without examining the sufficiency of the line-haul rate to cover it."

adequate showing that the aggregate charge for the through service is reasonable." 256 I. C. C., at 468. The explicit purpose of the rule in this situation is to guarantee that shippers receiving the same service that they had previously received do not pay an unreasonable amount. See also *Duluth Dockage Absorption,* 44 I. C. C. 300 (1917); *Terminal Charges at Pacific Coast Ports,* 255 I. C. C. 673, 682 (1943). The rule, in this regard, is that the railroads must demonstrate both that the proposed charge is reasonable in light of the costs of the separate service, and that the total charge for line haul plus the separate service is reasonable.

The Commission justified its departure from its prior cases by giving two reasons that relate to this aspect of the rule. First, it noted that "[t]he line-haul rates applicable on the grain to, from, and through [the] inspection points number in the thousands and, because of the complexities of the grain rate structure, vary to a large degree." Thus, applying the general rule "effectively precludes respondents from ever establishing a separate charge for the accessorial first stop for inspection regardless of the need for such a charge." Second, the Commission said that "the line-haul rate applicable to any movement of grain . . . when coupled with the proposed charge is less than the maximum reasonable level determined by this Commission. In no instance will the combined rate and charge exceed the maximum level prescribed in *Grain and Grain Products*[, 205 I. C. C. 301 (1934) and 215 I. C. C. 83 (1936)]." 339 I. C. C., at 386–387.

The maximum rates prescribed in *Grain and Grain Products* have been subjected to a large number of general rate increases.[7] See, *e. g., Ex parte Nos. 265 and*

---

[7] Currently effective rates are, on almost every route, lower than the rates permitted by the general maximum. See 340 I. C. C., at 71. Often this results from competition from other modes of trans-

*267, Increased Freight Rates, 1970 and 1971,* 339 I. C. C. 125 (1971). In those proceedings, the Commission's focus is on the general revenue needs of the railroads. Across-the-board percentage increases are permitted without detailed examination of individual rates. As a result, there may be specific routes on which the maximum is in fact unreasonable, because, for example, the costs of operating those routes have not increased as rapidly as the costs elsewhere. Thus, the Commission has held that its approval of a general increase "does not have the effect of approving any particular increased rate as not being in excess of a maximum reasonable rate." *Coal from Illinois to Alton and East St. Louis,* 274 I. C. C. 637, 670 (1949). See also *Tennessee Produce & Chemical Corp.* v. *Alabama G. S. R. Co.,* 277 I. C. C. 207 (1950); *Brimstone R. Co.* v. *United States,* 276 U. S. 104 (1928). However, in other contexts, the Commission has treated the prescribed rates as modified by general increases as "the best evidence of the reasonableness of corresponding rates on a . . . date" after the general increase. *Agsco Chemicals, Inc.* v. *Alabama G. S. R. Co.,* 314 I. C. C. 725, 733 (1961). Cf. *Public Service Comm'n of North Dakota* v. *Great Northern R. Co.,* 340 I. C. C. 739, 750 (1972).

The Commission thus has not determined that a rate which does not exceed the current general maximum is reasonable. A shipper can challenge any such rate as unreasonable and, if he succeeds, may recover reparations. In addition, the Commission may prescribe a rate to be charged in the future. 49 U. S. C. §§ 8, 9, 13 (1), 15(1); *ICC* v. *Inland Waterways Corp.,* 319 U. S. 671, 687 (1943). In such proceedings, the shipper must show that the rate charged was unreasonable. Cf.

---

port which forces rates below what the railroads would like to charge.

*Louisville & N. R. Co.* v. *United States,* 238 U. S. 1 (1915); *Shaw Warehouse Co.* v. *Southern R. Co.,* 288 F. 2d 759 (CA5 1961).[8] In contrast, when a proposed rate increase is challenged by a shipper before it goes into effect, "the burden of proof shall be upon the carrier to show that the proposed changed rate . . . is just and reasonable." 49 U. S. C. § 15 (7).[9]

The Commission in this litigation referred to the burden that applying the rule would place on the railroads. It rather clearly intended by this to suggest that the importance of implementing the new charges and so of increasing the supply of available freight cars justified some modification of its usual allocation of the burden of going forward. Instead of requiring the railroads to produce substantial evidence that the total charges were reasonable, it would leave that determination to later proceedings in which a shipper seeking reparations might point to particular individual charges as unreasonable.

If this were all that was at stake, the Commission would have adequately identified the concerns behind

---

[8] MR. JUSTICE WHITE argues that, if a rate at the level of the general maximum is reasonable, and if the separate charge is reasonable, then surely a line-haul rate that is equal to the general maximum less the separate charge is reasonable. The flaw in his argument is that the Commission has never determined that rates at the level of the current general maximum are reasonable. That is, in the example suggested by MR. JUSTICE WHITE, the Commission has not determined what he says that it has "previously found—that 120 is a reasonable charge for both services." Without this premise, his argument fails.

[9] If the Commission finds that the proposed rates are unreasonable, rather than that the railroads failed to carry their burden of proof, that finding might be conclusive in a subsequent proceeding. Cf. *Mitchell Coal & Coke Co.* v. *Pennsylvania R. Co.,* 230 U. S. 247, 258 (1913); *ICC* v. *Atlantic Coast Line R. Co.,* 383 U. S. 576, 590–594 (1966). This does not, however, affect the burden placed on carriers in the suspension proceedings.

its course—in light of the pressing need to increase the freight car supply, it was not too much to require that shippers carry the burden of going forward. Such an assessment would surely permit a reviewing court to determine whether the Commission's action was consistent with congressional transportation policy. Unfortunately, though, the change involved in making the shippers claim that particular rates are unreasonable is not all that is at stake. For in proceedings for reparations, there is also a change in the burden of proof: the shipper must produce substantial evidence that the rate is unreasonable. This would appear to affect the likelihood that the shipper will prevail. There is a zone in which rates are reasonable, *United States* v. *Chicago, M., St. P. & P. R. Co.*, 294 U. S. 499, 506 (1935), and it would seem to be harder to establish that the proposed rates fell outside that zone than that they fell within it. Or so Congress believed, for it specified the allocation of the burden of proof in suspension proceedings as part of the cost to the carriers; in return for confining the power to suspend rates to the Commission, and so of eliminating the threat of long-drawn-out injunctive proceedings in the courts, Congress made the carriers carry a burden of proof that would otherwise not have been theirs. Cf. Part III, *infra*.[10]

---

[10] The argument urged in support of the Commission's order is, in essence, that the separate charge approved by it was just like a general rate increase because of the breadth of its application. However, the Commission did not use the language characteristic of general increase proceedings. See, *e. g., Ex parte 259, Increased Freight Rates, 1968*, 332 I. C. C. 714, 715, 792 (1969). And, if this were just like a general rate increase, serious questions would arise about the jurisdiction of the District Court to review the Commission's order. See *Atlantic City Electric Co.* v. *United States*, 306 F. Supp. 338 (SDNY 1969); *Alabama Power Co.* v. *United States*, 316 F. Supp. 337 (DC 1969), both aff'd by an equally divided court, 400 U. S. 73 (1970). Yet, although the parties have cited those

The Commission did not suggest that its approval of the proposed rates on the grounds it gave would alter the usual practice in actions for reparations. Nor did it say why the need for an increased supply of freight cars justified a significant change in the burden of proof. In this sense, the Commission's action was, as the District Court noted, "discriminatory per se."

It is even harder to understand from the Commission's opinion why it departed from the rule in prior cases protecting shippers who decide not to have in-transit inspections. If the separate charges are to be effective in alleviating the car-shortage problem, there must be a substantial number of shippers who do not seek in-transit inspections. Yet according to the Commission, the railroads need not show that the present line-haul rates are reasonable charges for the services provided to shippers who do not seek in-transit inspections. It would appear, thus, that the Commission has approved a policy that discriminates against what it hopes will be a very large number of shippers; it seems to have tried to justify its policy by citing reasons that affect only a much smaller class.

Some of the shippers who previously sought in-transit inspections will no longer do so. Others had the opportunity for such inspections. Now the railroads propose to eliminate some of the service previously provided, yet charge the same rates. The Commission in its prior cases has required railroads proposing a similar reduction in service either to show that the rates then in

cases to us, see Brief for the Interstate Commerce Commission 35; Brief for the Secretary of Agriculture 18; Brief for Wichita Board of Trade 32, they have not contended at any length that the District Court lacked jurisdiction over this litigation. This suggests that the parties, including the Commission, do not interpret the Commission's opinion as resting on the similarity between these cases and general rate increase cases.

effect did not compensate them, for the service, and thus that the service was being provided at no charge, or to reduce the existing rates. See, *e. g., Transit Charges, Southern Territory,* 332 I. C. C. 664, 683 (1968); *Loading of Less-Than-Carload Freight on Lighters in Norfolk, Va., Harbor,* 91 I. C. C. 394 (1924); *ICC* v. *Chicago, B. & Q. R. Co.,* 186 U. S. 320 (1902).

Nothing the Commission said suggests any reason why the railroads should not be required to follow the same rule in this case. At no time have rates ever been established, or found just and reasonable, when the railroads did not include the service of in-transit inspection. Perhaps the imperative need to increase the number of freight cars available to all shippers justifies some alteration of the general rule. Yet the Commission, when dealing with shippers who will continue to have in-transit inspections, invoked the fact that the new charges would not raise rates above those permitted by the general maximum. As to that class, the Commission apparently believed that it could not simply refuse to follow preexisting practices on the ground of exigency alone. The Commission offered no reason to distinguish the larger class from the smaller one, in that respect. But it might be that rates for services including an in-transit inspection, at the level of the general maximum, would be reasonable while rates for services without such inspections would be unreasonable at that level, or even below it. Thus, the fact that the new charges will not exceed the general maximum seems to have no bearing on the question of the reasonableness of the rates that will continue to be in force for now-reduced services.[11]

Perhaps the current line-haul rates really do not include a substantial amount attributable to the cost of

---

[11] The Commission may have intended to leave this question for later proceedings. But this course runs into the difficulties noted *supra,* at 813–814.

providing in-transit inspections. But cf. Tr. 231–232, 258–266. Or perhaps the Commission has some reason to reinterpret the prior cases suggesting that its rule reflects a concern for rates that are "increased" simply because of a reduction in services.

As in *Secretary of Agriculture* v. *United States*, 347 U. S., at 652, the Commission may have reasons for "following a procedure fairly adapted to the unique circumstances of this case." [12] But, as in that case, it must make these reasons known to a reviewing court with sufficient clarity to permit it to do its job. Even giving the Commission's opinion the most sympathetic reading that we find possible, we cannot discover in it an expressed reason for permitting the railroads to reduce their services without showing that the rates they propose to maintain are reasonable rates for the service they intend to provide.

### III

After holding that the matter must be remanded to the Interstate Commerce Commission for further proceedings, the District Court ordered, "The proposed charges are suspended and shall be ineffective until and unless otherwise ordered by this Court." No reasons for such an order were given; the District Court did not, for example, specify the nature of the harm to the shippers that would, presumably, injure them irreparably. Nor

---

[12] On remand, the Commission might explain more fully the course it followed, or it might adopt a different course, for example, by requiring the carriers to demonstrate the reasonableness of the line-haul rates for services provided without an in-transit inspection on a representative sample of routes. Most of the prior cases in which the Commission invoked the rule involved quite limited problems, often confined to a single route. But cf. *Transit Charges, Southern Territory*, 332 I. C. C. 664 (1968). If the Commission then explained why that procedure was responsive to the needs of the particular case, the prerequisites of judicial review would be satisfied.

did it explain the basis for its apparent belief that *Arrow Transportation Co.* v. *Southern R. Co.,* 372 U. S. 658 (1963), was distinguishable.

It was error to enter such an injunction. The District Court clearly had power to suspend the operation of the Commission's order pending the final determination of the shippers' suit. That power is given in terms by 28 U. S. C. § 2324: "The pendency of an action to enjoin, set aside, annul, or suspend any order of the Interstate Commerce Commission shall not of itself stay or suspend the operation of the order, but the court may restrain or suspend, in whole or in part, the operation of the order pending the final hearing and determination of the action." But an injunction forbidding the railroads to implement a proposed change in rates is not, strictly speaking, an injunction suspending the Commission's order. In this case, for example, the Commission's order stated that "the proposed new or increased charges for in-transit inspection of grain at various points in the United States are just and reasonable . . . ." 340 I. C. C., at 74. The only consequence of suspending that order is that the railroads may not rely, in some subsequent proceeding, on a Commission finding that the proposed rates were just and reasonable. In an action for reparations, for example, the railroads could not gain any benefit from the purported Commission approval of the increases.[13] See *Arizona Grocery* v. *Atchison, T. & S. F. R. Co.,* 284 U. S. 370 (1932). See also 49 U. S. C. §§ 1 (5), 10 (1). The Commission's order also provided that the proceeding be discontinued, and suspension of the order requires the Commission to reopen its inquiry.

---

[13] The Commission may, of course, approve the rates on a theory similar to that discussed in Part II of this opinion, justifying its refusal to require a showing of reasonableness by the fact that that question would be open in subsequent proceedings. A suspension of the Commission order would then have almost no practical meaning.

Carriers may put into effect any rate that the Commission has not declared unreasonable.  49 U. S. C. §§ 6 (3), 15 (1).  Suspension of the Commission's order thus does not in itself preclude the carriers from implementing a new rate.  The power conferred on the District Court by § 2324 does not in itself include a power to enjoin the railroads from implementing a proposed new charge. Rather, that power must be considered as at best ancillary to the general equitable powers of the reviewing court, and protective of its jurisdiction.  See *Arrow Transportation Co.* v. *Southern R. Co., supra,* at 671 n. 22; *Order of Conductors* v. *Pitney,* 326 U. S. 561, 567 (1946).  Cf. *Pittsburgh & W. Va. R. Co.* v. *United States,* 281 U. S. 479, 488 (1930); 28 U. S. C. § 1651 (a).  As this Court noted in *Scripps-Howard Radio, Inc.* v. *FCC,* 316 U. S. 4 (1942), such a power must be inferred from Congress' decision to permit judicial review of the agency action.  "If the administrative agency has committed errors of law for the correction of which the legislature has provided appropriate resort to the courts, such judicial review would be an idle ceremony if the situation were irreparably changed before the correction could be made."  *Id.,* at 10.

Yet it would be surprising if that power could be exercised to the extent that it might substantially interfere with the function of the administrative agency.  "The existence of power in a reviewing court to stay the enforcement of an administrative order does not mean, of course, that its exercise should be without regard to the division of function which the legislature has made between the administrative body and the court of review." *Ibid.*  Proper regard for that division of function requires that we hold erroneous the District Court's decision to enjoin not only the Commission's order finding the proposed rates just and reasonable but also the implementation of those rates.

In *Arrow Transportation Co.* v. *Southern R. Co., supra,* this Court considered a similar problem. The Interstate Commerce Commission has the power to suspend proposed rate changes for seven months, while it proceeds to consider the reasonableness of the proposal. "If the proceeding has not been concluded and an order made within the period of suspension, the proposed change of rate . . . shall go into effect at the end of such period." 49 U. S. C. § 15 (7). In *Arrow,* parties affected by proposed reductions sought an injunction against the implementation of the proposed reductions when, at the end of the suspension period, the railroads announced that they intended to put the new rates into effect. The Commission had not determined that those rates were reasonable. The Court concluded that Congress, by giving the Commission the power to suspend rates, had intended to preclude the courts from doing the same.

Here, of course, the Commission's proceeding has been concluded, or at least so the Commission thought when it entered its order. The terms of § 15 (7) do not specifically govern this situation. Nor is there any other provision in the relevant statutes depriving federal courts of their general equitable power to preserve the status quo to avoid irreparable harm pending review. Yet many of the considerations, relied on in *Arrow* and influencing this Court's definition of the proper relation between the courts and the Interstate Commerce Commission, must be drawn on to delineate guidelines for the exercise of the ancillary power, in a proceeding to review a Commission order, to enjoin a rate increase pending final determination of the suit.

The most important of these considerations is the group of policies that are encompassed by the term "primary jurisdiction." National transportation policy reflects many often-competing interests. Congress has established an administrative agency that has developed

a close understanding of the various interests and that may draw upon its experience to illuminate, for the courts, the play of those interests in a particular case. Cf. *Great Northern R. Co.* v. *Merchants Elevator Co.,* 259 U. S. 285 (1922); *United States* v. *Western Pacific R. Co.,* 352 U. S. 59 (1956). Ordinarily, then, a court should refrain from expressing a preliminary view on what national transportation policy permits, before the ICC expresses its view. But when a court issues an injunction pending final determination, one important element of its judgment is its estimate of the probability of ultimate success on the merits by the party challenging the agency action. *Virginia Petroleum Jobbers Assn.* v. *FPC,* 104 U. S. App. D. C. 106, 110, 259 F. 2d 921, 925 (1958). Depending on the type of error the reviewing court finds in the administrative proceedings, the issuance of an injunction pending further administrative action may indicate what the court believes is permitted by national transportation policy, prior to an expression by the Commission of its view. This is precisely what the doctrine of primary jurisdiction is designed to avoid. Cf. *Order of Conductors* v. *Pitney, supra; Locomotive Engineers* v. *M.-K.-T. R. Co.,* 363 U. S. 528, 533 (1960). The fact that issuing an injunction may undercut the policies served by the doctrine of primary jurisdiction is therefore an important element to be considered when a federal court contemplates such action.[14]

---

[14] *Locomotive Engineers* v. *M.-K.-T. R. Co.,* 363 U. S. 528 (1960), shows that not all judicial injunctions infringe on an agency's primary jurisdiction. There the Court noted that the District Court's "examination of the nature of the dispute is so unlike that which the [agency] will make of the merits of the same dispute, and is for such a dissimilar purpose, that it could not interfere with the later consideration of the grievance by the [agency]." *Id.,* at 534. Here, in contrast, the District Court must consider whether the Commission is likely to find reasons for its

As we have indicated in Part II of this opinion, we require the agency to justify its departure from its prior decisions so that we may understand what policies it is pursuing. If a reviewing court cannot discern those policies, it may remand the case to the agency for clarification and further justification of the departure from precedent. But an injunction pending the completion of those proceedings would be warranted only if the reviewing court entertained substantial doubt about the consistency of the Commission's action with its mandate from Congress. Cf. *Virginian R. Co.* v. *United States,* 272 U. S. 658, 673 (1926).[15] When a case is remanded on the ground that the agency's policies are unclear, an injunction ordinarily interferes with the primary jurisdiction of the Commission.[16] Cf. *Arrow Transportation Co.* v. *Southern R. Co.,* 372 U. S., at 669–670.

---

action that are consistent with congressional policy. Not only is such a question exceedingly complex, it is also just what the Commission itself must decide before approving the proposed new charges.

[15] In some cases, the reviewing court might explicitly refrain from considering the likelihood of success on the merits in deciding whether or not to issue an injunction. Then, if the possibility of irreparable damage to the party seeking review or to other interests is great enough, an injunction may perhaps be justified. See, *e. g., Semmes Motors, Inc.* v. *Ford Motor Co.,* 429 F. 2d 1197, 1205–1206 (CA2 1970); *Checker Motors Corp.* v. *Chrysler Corp.,* 405 F. 2d 319, 323 (CA2 1969). Here, however, the District Court did not clearly refuse to assess the likelihood of ultimate success and, as indicated *infra,* the possibility of irreparable harm to the shippers is quite small.

[16] This analysis turns on the fact that the type of error in these cases involves precisely a failure by the Commission to do the job committed to it, the proper performance of which is a predicate of the doctrine of primary jurisdiction. Where the error might be considered purely procedural, for example where the Commission failed to consider relevant evidence on grounds the reviewing court finds inadequate, the issuance of an injunction might not interfere with

In addition, the reviewing court must consider whether irreparable harm will result if the injunction is not issued and the party seeking it prevails on the merits. *Order of Conductors* v. *Pitney, supra.* That too may interfere with the agency's primary jurisdiction. We deal here with a dispute between shippers and carriers. In giving the Interstate Commerce Commission power to suspend proposed rate increases, Congress allocated the benefit and harm of a suspension. For a period of up to seven months, the carriers may not collect the increases if the Commission suspends them. The income that they might have gained is lost to them forever. Congress did provide protection to shippers for the period after the rates go into effect. The Commission may require the carriers to keep detailed accounts of the income received as a result of the increase. If the in-

---

the agency's primary jurisdiction quite so severely. Yet even there, before issuing an injunction the reviewing court must consider whether the Commission would have come to a different conclusion had it considered the evidence. And that may sometimes impinge on the sphere committed to the Commission for initial decision.

This Court has distinguished between blatantly lawless action and mere procedural error in cases raising similar questions of the power of courts to intervene in administrative action. See *Oestereich* v. *Selective Service Bd.,* 393 U. S. 233 (1968); *Fein* v. *Selective Service System,* 405 U. S. 365 (1972).

Different considerations would come into play, too, when the reviewing court finds some failure by the carriers in the suspension proceeding, rather than a failure by the Commission to do its task. A reviewing court might find, for example, that the Commission's conclusion that the carriers had carried the burden of proof to justify the increase was not supported by substantial evidence. Although phrased as a finding of administrative error, this in fact relates to the presentation of evidence by the carriers.

Finally, this litigation involves only claims under the Interstate Commerce Act. Subsequent legislation might affect the relation between court and agency and so the propriety of injunctive relief. Whether it does so must be determined by examining that legislation.

crease is ultimately found unjustified, the Commission may order a refund. 49 U. S. C. § 15 (7). Even if the Commission does not do so in a suspension proceeding, the shippers may recover reparations under some circumstances. 49 U. S. C. §§ 8, 9. Thus, it is often quite unlikely that shippers will be irreparably damaged by the implementation of a rate increase.[17]

There are, however, public interests at stake in this litigation, as well as the private interests of the shippers and carriers. The Commission found that inspection of grain is required for the orderly marketing of grain. 339 I. C. C., at 385. Inspections will thus continue to be made. But now, if the Commission ultimately approves the new charges, there will be a separate charge for them, either by the railroads under the new charges, or by someone else engaged in marketing grain. This extra cost must be absorbed by someone, perhaps by farmers, perhaps by the ultimate consumers of grain. See Tr. 1299. The impact of rates on various groups in this country is surely relevant to deciding that the rates are consistent with national transportation policy.

But the public interest is not a simple fact, easily determined by courts. Here, for example, the interests of farmers and consumers of grain must be balanced against the interests of producers and consumers of all sorts of other goods shipped by rail. For the premise of the Commission's action in this case was that separate charges for in-transit inspections would alleviate the freight-car shortage. The shortage itself increases the

---

[17] The interests of other carriers who might object to a proposed rate change are somewhat different. They are not damaged, as the shippers are, by out-of-pocket expenditures, and refunds or reparations do not remedy the loss of business that they might suffer. This factor would thus have less weight in suits by such carriers, although the problem of interfering with primary jurisdiction must still be considered.

cost of transporting a wide range of products by rail. Thus, the decision that must be made is whether the car shortage has a more significant impact on the national economy than does increased cost for grain products. Congress has committed that decision to the Interstate Commerce Commission in the first instance, and the extent of harm to farmers and consumers of grain cannot be estimated without interfering with the primary jurisdiction of the Commission.[18]

As this discussion shows, it is very likely that a decision to enjoin rates pending reconsideration by the Commission in order to clarify its policies will imply some view by the District Court about decisions committed to the Commission by the doctrine of primary jurisdiction. The District Court's power to enjoin rates, in order to protect its jurisdiction to review Commission orders, must therefore be exercised with great care and after full

---

[18] Although they are far less substantial than the problems of primary jurisdiction and irreparable injury, procedural problems might also arise when a district court considers a request for an injunction like that issued here. Review of Commission orders is by a three-judge district court. The United States is the defendant. 28 U. S. C. §§ 2321, 2322. Railroads which appeared before the Commission have a right to intervene, 28 U. S. C. § 2323, but they need not do so. If a railroad chose not to intervene, the district court could not enjoin it from implementing the new charge. The plaintiffs could, of course, compel an unwilling railroad to appear. Fed. Rule Civ. Proc. 19 (a). But, even though service of process is nationwide, 28 U. S. C. § 2321, some plaintiffs might find it difficult to serve every railroad that did not appear willingly. The presence before the reviewing court of all interested parties, or only some of them, is therefore relevant to the exercise of the court's discretion to enjoin a proposed rate increase. Like the other factors discussed in this opinion, this does not establish that the district court lacks power to enjoin the implementation of proposed rate increases after a final Commission order, but it is a factor to be considered in determining whether to exercise equitable discretion to issue such an injunction.

and detailed consideration of the problems set out above. It will not do to enter such an injunction in the off-hand manner of the District Court. Cf. *Virginian R. Co.* v. *United States,* 272 U. S. 658 (1926). Here the District Court could not consider the likelihood of success on the merits or where the public interest lies without infringing on decisions committed by Congress to the primary jurisdiction of the Interstate Commerce Commission, and the possibility of harm to the shippers was small. It was therefore improper to enter an injunction against the implementation of the proposed new charges.

Here the Commission ordered the railroads to maintain records of the amounts collected as a result of the new charge. It may be that this adequately protects the shippers from irreparable damage, in light of the availability of actions for reparations. The Commission may determine on remand that some further steps must be taken to protect the shippers. But in any event, it is clear that the District Court should not have entered the injunction it did. The action of the District Court is affirmed as to the remand to the Commission and is reversed as to the injunction suspending the proposed charges.

*So ordered.*

MR. JUSTICE POWELL took no part in the consideration or decision of these cases.

MR. JUSTICE DOUGLAS, concurring in the affirmance of the remand to the Commission and dissenting from the reversal of the decree authorizing the injunction.

Though I concur in the affirmance of the remand to the Interstate Commerce Commission, I dissent from the reversal of the decree authorizing the injunction, since in my view the District Court was quite correct in issuing its injunction. *Arrow Transportation Co.* v.

*Southern R. Co.,* 372 U. S. 658, is not relevant here, for the reason that 49 U. S. C. § 15 (7) only purports to control the suspension of rates up until the time the Commission has rendered a decision. After that decision has been made, the reviewing court has, I believe, the power to enjoin the affected rates. The new charges which the Commission would impose would have an immediate impact upon the grain-marketing system. It would affect the volume of business of the grain merchants, it would affect the employment of grain inspectors, and it would result in lower prices being paid to the farmers. None of these incidences can be remedied under the existing statutory scheme, because none of these interests is enabled to bring suit for a later rate refund. Hence, in my view, the grain trade and the farmers need this interim protection lest in inspection the marketing system suffer severe attrition during the period of remand. The deciding principle is that the District Court sits as a court of equity, *United States* v. *Morgan,* 307 U. S. 183, 191, and as a court of equity has, I believe, ample power to protect the grain market nationally which would otherwise be without remedy under the existing statutory regime.

Jurisdiction is granted the District Court "to enforce, enjoin, set aside, annul or suspend" any order of the Interstate Commerce Commission. 28 U. S. C. § 1336 (a). For years, the type of order here involved* was not reviewable. See *Procter & Gamble Co.* v. *United States,* 225 U. S. 282. But that "negative" order concept was abandoned in *Rochester Tel. Corp.* v. *United States,* 307 U. S. 125, 145. The provisions of 28 U. S. C. § 1336 (a), are an explicit grant of power to

---

*The order of Division 2 of the Commission provided that the proceeding "be, and it is hereby, discontinued." 339 I. C. C. 364, 401. The order of the Commission en banc affirming is in 340 I. C. C. 69, 74.

provide injunctive relief. Under that Act the "govern-
ing principle" is "that it is the duty of a court of equity
granting injunctive relief to do so upon conditions that
will protect all—including the public—whose interests
the injunction may affect." *Inland Steel Co.* v. *United
States,* 306 U. S. 153, 157. That power exists whether the
Commission's authority over rates is challenged under
49 U. S. C. § 15 (1) as being unjust or unreasonable or
under 49 U. S. C. § 15 (7) relating, as here, to "a new
individual or joint rate, fare, or charge." In all cases the
District Court by reason of 28 U. S. C. § 1336 (a) sits as
a court of equity.

MR. JUSTICE WHITE, with whom MR. JUSTICE BREN-
NAN and MR. JUSTICE REHNQUIST join, concurring in the
reversal of the injunction and dissenting from the affirm-
ance of the remand to the Commission.

I dissent because the District Court erred both in
holding that the Commission had inadequately explained
the basis for its judgment and in suspending the new in-
transit inspection tariff beyond the time the statute per-
mits new rates to be suspended without a finding that
they are unjust and unreasonable.

As to the latter, 49 U. S. C. § 15 (7) forbids the sus-
pension of new freight rates for more than seven
months without the requisite finding of unreasonableness
by the Commission. Only the Commission may suspend
in the first instance; and if the agency refuses to do so,
the court is powerless itself to suspend. The Commission
may postpone effectiveness of new rates for seven months,
but if it does, the statute commands that, absent the
appropriate order of the Commission within that
period, "the proposed change of rate . . . shall go into
effect . . . ." To permit the District Court neverthe-
less to extend this period seems to me to be flatly con-
trary to the will of Congress. I therefore cannot

agree that, although the District Court has no statutory power to do so, it nevertheless retains sufficient power to enjoin the rates as "ancillary to the general equitable powers of the reviewing court, and protective of its jurisdiction." *Ante,* at 819. As I see it, the District Court contravened the precepts of *Arrow Transportation Co.* v. *Southern R. Co.,* 372 U. S. 658 (1963).

As for the remand to the Commission, there is somewhat more to be said. The Commission found, and it is not questioned by the District Court or by the majority here, that in-transit inspection of grain is not an essential part of transportation service but only ancillary to it; that the premarketing inspection of grain, in transit or otherwise, is no longer required by federal law; that in-transit inspection of grain has been the regular practice in Western territory, to some extent the practice in Southern territory, but not in Eastern territory; that the line-haul rates for grain in Western and Southern territories established by the railroads or prescribed by the Commission have provided one free in-transit inspection stop, but a separate charge for that service is the practice in Eastern territory; [1] and that, because of recent developments in-transit inspection is no longer an essential service

---

[1] The Commission noted:

"It is again emphasized that the major impact of the proposal under consideration will be on the movement of grain in the western district. Most inspections occur in this territory. There is presently effective a separate charge for this service in the East. A substantial increase in those charges will result, however, if the proposed charges are permitted to become effective. The number of in-transit inspections in the South is limited and take place chiefly at the ports on export grain tonnage. There is little, if any, opposition to establishment of the charges in southern territory. Practically all of the controversy is concerned with establishment of the separate charge for the first inspection of grain within the western district." 339 I. C. C. 364, 385.

for the orderly marketing of grain in Western and Southern territories. Furthermore, the unquestioned finding of the Commission was that the principal motivation for imposing a separate charge for in-transit grain inspection was not to increase railroad revenues through collection of the charge itself but to promote efficient utilization of freight cars by discouraging the practice of in-transit inspection which had proved extremely wasteful in terms of car utilization. The Commission finding, also undisturbed, was that the separately stated inspection fee would discourage the practice of in-transit inspection, would contribute to a more efficient utilization of freight cars, and hence help relieve the unquestioned grain-car shortage.

With these important preliminary findings and conclusions behind it, the Commission examined in detail the reasonableness of the separate charge being imposed for in-transit inspection of grain. Its conclusion was that the charge was reasonable, a judgment not overturned either here or in the District Court. Finally, the Commission noted that by the terms of the new tariff itself, separate in-transit inspection charges could not be collected where the combination of the new, separate charge and the existing line-haul rate exceeded the maximum reasonable level of grain rates established in Docket 17,000, pt. 7, *Grain and Grain Products*, 205 I. C. C. 301 (1934); 215 I. C. C. 83 (1936), as raised by subsequent general revenue increases. Docket 17,000, pt. 7, *Rate Structure Investigation,* was a major national effort, a comprehensive investigation of rates on agricultural products, and resulted, among other things, in the Commission's prescribing maximum reasonable freight rate levels for movements of grain. Since that time, there have been general rate increases for revenue purposes, in the course of which the rates on grain and their structure as required by the 1934 and 1936 determinations have

been given special attention. See, for example, *Increased Freight Rates, 1967,* 332 I. C. C. 280, 300 (1968).

Under the new tariffs now filed, as I have said, if the applicable line-haul rate on the particular grain movement involved is at the maximum reasonable level theretofore prescribed by the Commission in previous proceedings, no separate in-transit inspection charge is imposed or allowable, nor may the combination of the new charge and the existing line-haul rate collected by the railroad exceed the maximum allowable rate as previously determined. This is the key to understanding that, in approving the separate inspection charge, the Commission did not ignore its longstanding rule that railroads may not impose separate charges for an ancillary service previously furnished under a line-haul rate unless both the reasonableness of the separate charge and the line-haul rate are scrutinized. *Transit Charges, Southern Territory,* 332 I. C. C. 664, 683–684 (1968), is, for example a relatively recent restatement of the rule.[2] The Commission thought this rule not controlling here because, in the first place, the magnitude of the task of justifying each one of a countless number of line-haul grain rates would, as a practical matter, prohibit the imposition of a separate in-transit inspection charge and so frustrate the important nonrevenue goal of discouraging in-transit inspection and so improving car utilization.

But, more fundamentally, the Commission in any event deemed the rule satisfied; for here the reasonableness of

---

[2] The Commission's order was sustained, on other grounds, in *Cincinnati, N. O. & T. P. R. Co.* v. *United States,* Civil Action No. 6692 (SD Ohio, Jan. 12, 1970), aff'd, 400 U. S. 932 (1970). The District Court sustained the Commission on the basis that the proposed increase in charges might well result in a substantial diversion of the considered traffic, with a diminution, rather than an increase, in revenues. In the present case, the Commission noted: "Similar conclusions are not warranted here."

the line-haul rate was sufficiently examined and ensured by proof that the new charge was itself reasonable *and* by prohibiting its collection if the total cost of the grain movement—its line-haul charge plus the separate inspection charge—exceeded the maximum reasonable rate theretofore prescribed by the Commission, that is, the maximum reasonable rate the Commission had *theretofore prescribed for both the transportation service and the privilege of in-transit inspection.*

This approach seems straightforward and adequate. Keeping in mind that Docket 17,000, Part 7, as was customary in Western territory, prescribed rates for grain movements permitting one in-transit inspection without extra charge, let us assume, for example, that the maximum rate prescribed by the Commission for a particular grain movement with in-transit inspection privileges was 120. Assume further what is the recurring situation in the case before us—that the railroad is charging less than it may, say 100, for the grain movement with that privilege. The railroad then publishes a tariff under which the line-haul rate of 100 no longer entitles the shipper to in-transit inspection, and a separate charge of 20 is imposed on those who want that service. The line-haul charge plus the separate in-transit inspection charge does not exceed what the Commission has heretofore ruled the railroad may collect for both the transportation and the inspection service. This calculus seems to me an adequate basis for concluding that the line-haul rate of 100 is itself within the zone of reasonableness. If a railroad may charge 120 for a grain movement with in-transit inspection provided, and the inspection stop is proved reasonably worth 20, why should there also be occasion for considering the reasonableness of 100 as a line-haul rate and so proving again what the Commission previously found—that 120 is a reasonable charge for both services?

The District Court thought the Commission ignored *Secretary of Agriculture* v. *United States,* 347 U. S. 645 (1954), but I read that case far differently. There the Court, although being of the opinion that the Commission had not adequately explained why it was approving a separate charge without examining the legality of the line-haul rate, was careful to point out that the Commission was not precluded "from following a procedure fairly adapted to the unique circumstances of this case"; nor did the Court question "the Commission's power, under appropriate findings, to approve such unloading charges without pursuing one of these courses. In dealing with technical and complex matters like these, the Commission must necessarily have wide discretion in formulating appropriate solutions." *Id.,* at 652. That case does not stand for the rule that a separate charge for an ancillary service may in no circumstances be permitted without new proof in *that* proceeding of the reasonableness of the line-haul rate.

The prior decisions of the Commission relied upon by the District Court establish clearly enough that the Commission must be satisfied with the reasonableness of the line-haul rate as an exaction for the remaining services before approving a separate charge for a service previously covered by the line-haul rate. *Transit Charges, Southern Territory, supra; Terminal Charges at Pacific Coast Ports,* 255 I. C. C. 673 (1943) ; *Reconsignment Case No. 3,* 53 I. C. C. 455 (1919); *Loading of Less-Than-Carload Freight on Lighters in Norfolk, Va., Harbor,* 91 I. C. C. 394 (1924). In these cases, the carriers simply failed to carry their burden of proof.

The District Court also cited for this proposition *Grand Forks Chamber of Commerce* v. *Great Northern R. Co.,* 321 I. C. C. 356 (1963), but the Commission in that case, see *id.,* at 360–362, did precisely what it has done in this one: it approved a separate in-transit in-

spection charge in the case of so-called Group 3 rates where the line-haul rate and the new charge together were less than so-called Group 1 rates prescribed in *Grain and Grain Products,* 205 I. C. C. 301 (1934); 215 I. C. C. 83 (1936). See also *Public Service Comm'n of North Dakota* v. *Great Northern R. Co.,* 340 I. C. C. 739 (1972); *Alabama State Docks Dept.* v. *Alabama, T. & N. R. Co.,* 321 I. C. C. 347 (1963); *Agsco Chemicals, Inc.* v. *Alabama G. S. R. Co.,* 314 I. C. C. 725 (1961).

Neither do I understand why the majority is comforted by the opinion in *Cincinnati N. O. & T. P. R. Co.* v. *United States,* Civil Action No. 6992 (SD Ohio, Jan. 12, 1970), in which the District Court affirmed, but on very limited grounds (grounds that would save the cases before us now), the Commission's disallowance of a separate transit charge for cotton movements but disapproved the stringent standard by which the Commission required the railroads to prove the reasonableness of the resulting line-haul rate. The District Court restated the prevailing rubric:

"The question here is what should the carrier be paid for a service which it has been rendering, and has been charging for, and has been paid for (one knoweth not what) which it proposes to separate and charge separately for. Both the courts and the Commission have consistently held that what is a just and reasonable rate for the service to be separated and charged for separately cannot be determined by examining only the typical questions of cost, etc., with respect to the separate service. On the contrary, the typical questions must be directed to the overall or combined picture so that one may conclude (a) that the rate for the separated service, looked at by itself in the light of the applicable questions, is just and reasonable; and (b) that the

remaining rate for the services, sans the separated service, is not rendered unjust or unreasonable."

The District Court continued:

"Whether the examination is in terms of 'what portion of the line-haul rate represented the rate for the service to be separated,' or whether the search in terminology is for the answer to this question: *Does the new aggregate rate, composed of line-haul plus transit rates represent a just and reasonable rate for all of the services (the aggregate of the severed and the nonsevered)—the principle is the same."* (Emphasis added.)

A few paragraphs later, the court repeated the same alternate approach. This Court affirmed the District Court summarily. 400 U. S. 932 (1970). In the litigation now before us the total of the line-haul rate and the separate in-transit charge will in no case exceed what the Commission has heretofore found to be a reasonable charge for the aggregate service.

The maximum permissible rates for grain movements with in-transit inspection privileges were established some years ago, it is true, but they have been subject to repeated examination upon the occasions of general rate increases and, as this litigation itself shows, they are far from dead letters from the standpoint of either the railroads or the Commission. They remain the foundation of the Commission's opinion as to what just and reasonable grain rates are with in-transit privileges furnished by the railroad. I see no reason for now disagreeing with the Commission's judgment that the reasonableness of a line-haul rate lower than the maximum allowable has been sufficiently re-examined to permit imposition of a separate in-transit inspection charge, in itself found reasonable, when it is also determined that the existing

line-haul rate and the new inspection charge together total less than the maximum Commission-prescribed rate for the two services combined. Surely this presents an inadequate occasion or context in which to frustrate what the Commission found to be a promising effort to solve a critical problem—the freight car shortage—by seeking to deter a wasteful practice not indispensable or even, in the Commission's view, unusually important to the orderly marketing of grain under modern conditions.

For these reasons, I respectfully dissent.