**CITY OF CHEROKEE, Farmer's Co-Op, Archer Co-Op, Calumet Feed Service, Metz Baking Company, Ray Halder AGG Lime Service, Towena Elevator & Mill, C. S. Agro Corporation, Farmer's Co-Op George Iowa, Boyden AGG Lime and M. S. Stuckey, Petitioners,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents,**

**Illinois Central Gulf Railroad Company, Intervenor-Respondent.**

No. 81–1607.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 16, 1981.

Decided Feb. 17, 1982.

Rehearing and Rehearing En Banc Denied March 31, 1982.

Marvin Wallace Miller, City Sol. (argued), Cherokee, Iowa, Gordon P. MacDougall (argued), Washington, D. C., for petitioners.

William F. Baxter, Asst. Atty. Gen., John J. Powers, III, Kenneth P. Kolson, Attys., Dept. of Justice, Richard A. Allen, Gen. Counsel, Henri F. Rush, Associate Gen. Counsel, Edward J. O'Meara (argued), Attys., I. C. C., Washington, D. C., for respondents.

Howard D. Koontz, John H. Doeringer, Chicago, Ill., R. Eden Martin, Lawrence A. Miller (argued), David M. Levy, Washington, D. C., Charles E. Dapron, John P. Emde, St. Louis, Mo., for Illinois Central Gulf R. Co.

Before HEANEY, ROSS and STEPHENSON, Circuit Judges.

HEANEY, Circuit Judge.

This matter arises in connection with abandonment proceedings previously reviewed by this Court. *See City of Cherokee v. ICC,* 641 F.2d 1220 (8th Cir. 1981). The Illinois Central Gulf Railroad (ICG) seeks to abandon service on a 96-mile branch line between Cherokee, Iowa, and Sioux Falls, South Dakota. ICG's abandonment application was initially denied by an administrative law judge who found that "public convenience and necessity" supported continued service on the line and that, under applicable cost accounting standards, the line made a positive contribution to ICG's income. *Id.* at 1223. The Interstate Commerce Commission (ICC), however, applied different cost criteria and a different standard for balancing the public and private interests affected by abandonment. The ICC voted to issue a certificate of abandonment, but we reversed and remanded the case for further proceedings consistent with proper abandonment standards. *Id.* at 1228–1230. We stayed our mandate, however, to permit the ICG and the ICC to seek review by the Supreme Court. The Justice Department argued that certiorari should be denied and that the matter should be reopened before the ICC. *See Memorandum for the United States,* S.Ct. Docket Nos. 80–2122, 81–350. The Supreme Court subsequently denied certiorari, 50 U.S.L.W. 3278 (Oct. 13, 1981), and our man-

date took effect. The abandonment proceedings have been reopened and appear to be near completion. *See* I.C.C. Docket No. AB–43 (Sub–No. 47) (Decision of Nov. 4, 1981, reopening proceedings and scheduling hearings for January, 1982).

Within weeks of our decision remanding the matter and while the certiorari petition was pending, ICG filed a unilateral tariff increase of more than $1,000 per car for all traffic moving on the branch line. This surcharge would more than double the present freight rates on the line. The ICC accepted the surcharge and refused petitioners' request to suspend and investigate it. We stayed the surcharge pending this decision. We now remand the rate proceeding to the ICC for a hearing at which the petitioners and the ICG may show whether the surcharge is proper under the criteria set forth in the Staggers Rail Act. ICG is enjoined from implementing the surcharge until such time as the foregoing hearing is held and the ICC makes a determination based thereon.

 The petitioners herein are citizens, shippers and local governments that rely on the branch line which ICG seeks to abandon. As we earlier found, abandonment would have a devastating effect both on the petitioners' economic lives and on the essential quality of life in the affected communities. *See City of Cherokee v. ICC, supra,* 614 F.2d at 1224–1225, 1229–1230. The petitioners contend that the $1,000-per-car surcharge is designed to effect a *de facto* abandonment of the branch line—achieving in practice what this Court held is impermissible at the present time.[1] The petitioners, therefore, construe the rate surcharge as an attempt to interfere with this Court's jurisdiction and to thwart the clear mandate of this Court. We agree.

The timing of the ICG's action is more than suspect. Within weeks of our initial decision remanding the abandonment matter, the ICG announced that it would immediately increase by more than one hundred percent the freight charges for all commodities that move on the branch line. The

---

1. We intimate no views with respect to the reopened abandonment proceedings. Our unambiguous holding, however, was that the ICG

could not abandon the line based upon the showing it had made.

petitioners' verified complaint indicates, based upon a canvass of shippers along the affected line, that no freight will move if the surcharge becomes effective. Even if traffic is not eliminated totally, a significant reduction in traffic appears to be an obvious result. Such a reduction in traffic and related revenues would fundamentally alter the reopened abandonment proceedings by turning what the ALJ found to be a marginally successful line into a certain loser. Given the magnitude and timing of ICG's proposed surcharge, we must conclude that it was deliberately imposed to interfere with our remand of the abandonment question, if not to render the abandonment proceedings moot.[2]

Despite these circumstances, the ICG, and the ICC argue that this Court has no power to review the surcharge, relying on the rule that ICC decisions not to suspend a tariff are generally not reviewable. *See, e.g., Consol. Rail Corp. v. Nat. Ass'n of Recycling Ind.*, 449 U.S. 609, 101 S.Ct. 775, 777, 66 L.Ed.2d 776 (1981) (per curiam); *Southern Railway Co. v. Seaboard Allied Milling Corp.*, 442 U.S. 444, 99 S.Ct. 2388, 60 L.Ed.2d 1017 (1979).

■ We recognize this general rule, but find no need to disturb it. Our jurisdiction arises from quite another source: this Court has the power to review the surcharge to the extent that is necessary to protect our undisputed jurisdiction over the abandonment proceedings. *See, e.g.,* 28 U.S.C. § 1651(a) (1980) (All Writs Act); *Atchison, T. & S.F. R. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 820, 93 S.Ct. 2367, 2381, 37 L.Ed.2d 350 (1973). This source of jurisdiction is narrow, but here, the petitioners

have made a prima facie showing that the surcharge is intended to interfere with our clear mandate and jurisdiction in the abandonment case. In such circumstances, the power to review the surcharge arises out of necessity. Because these are not the ordinary circumstances in which rate questions arise, invoking jurisdiction in this case will have little impact on the general doctrine of nonreviewability.[3]

The merits of the surcharge present a more difficult question. The petitioners ask us to declare the surcharge unlawful on the theory that any surcharge which will effect a *de facto* abandonment is an illegal circumvention of the statutory requirements for abandonment. We cannot accept this theory in light of the Staggers Rail Act of 1980.

■ We first note that before passage of the Staggers Act, a unilateral surcharge such as ICG's would have been impossible. The Staggers Act, however, authorizes railroads to publish a branch line surcharge if, without such a surcharge, revenues from the line would not cover 110% of the variable costs of transporting traffic to or from the line, plus one hundred percent of the railroad's "reasonably expected costs" of continuing to operate the line. *See* 49 U.S.C. § 10705a(b)(2) (Supp.1981). Although there are several procedures by which shippers may protest a surcharge, the Staggers Act expressly prohibits the ICC from reducing the surcharge rates to a level below the 110%/100% formula. *See id.,* §§ 10705a(a)(1)(B)(iv), (a)(3)(B), (b)(3)(C). Thus, the statute sets a minimum revenue standard which a railroad may seek to achieve through a surcharge.

---

**2.** The ICG has never disputed these claims as to its intent and the effect of its surcharge. ICG argues such considerations are immaterial. *See infra* at 1085.

**3.** ICG relies in part on several recent Circuit Court decisions which indicate that ICC decisions not to suspend surcharges are unreviewable. *See, e.g., Mississippi Pub. Service Comm. v. ICC*, 662 F.2d 314 (5th Cir. 1981). None of the cases cited by the ICG involved surcharges which were attempts to interfere with the Court's abandonment jurisdiction. In *Mississippi Pub. Service Comm. v. ICC, supra,* aban-

donment proceedings were in progress before the ICC at the time of the surcharge, but such proceedings were not before the Court. Because the All Writs Act does not create jurisdiction where none previously existed, it may have been appropriate to decline to invoke the Act in *Mississippi.* Here, however, this Court has undisputed jurisdiction over the abandonment proceedings and has remanded the matter to the ICC. Having found that the surcharge is an attempt to interfere with our mandate, it is necessary and appropriate to protect our jurisdiction under the All Writs Act.

■ The petitioners' contention is that, regardless of whether a surcharge meets the 110%/100% standard, it is *per se* unlawful if its effect will be to eliminate movement of traffic on the line. There is no basis in the statute, however, for applying such a *de facto* abandonment standard. Moreover, to apply such a standard would require us to engage in impossible factfinding. We would first have to resolve disputes between shippers and carriers as to the effect of a particular surcharge. Even assuming, for example, that the proposed surcharge here would result in a *de facto* abandonment, by what criteria are we to determine whether a lesser surcharge is permissible, and if so, at what level? We must turn to the statute for such criteria and the statute clearly sets forth the 110%/100% formula. Congress has declared that this standard is controlling and it is to Congress that the petitioners must turn for relief if a surcharge which meets this standard will result in *de facto* abandonment.

There has been no determination, however, that the $1,000-per-car surcharge does in fact comport with the statutory standard. The petitioners, the ICG and the ICC have all focused on the *de facto* abandonment theory. Indeed, the petitioners could not have shown whether the surcharge exceeds the statutory formula because the ICC had failed to promulgate rules defining the "reasonably expected cost" component of the formula. The issue thus becomes whether the petitioners should have an opportunity to demonstrate to the ICC that the proposed surcharge exceeds the statutory formula or is otherwise impermissible under the Staggers Act. We think they should.

■ In adopting the Staggers Act, Congress gave railroads sweeping new powers to set their own rates, but imposed the 110%/100% standard as a check against abuse of such power. As the legislative history states: "[a] shipper's remedy is to protest the rate on the grounds that the

surcharge exceeds 110 percent of the variable costs of carrying the traffic to the line and 100 percent of the reasonably expected costs of continuing service over the line." H.Rep.No. 96–1035, *reprinted in* 4 U.S.Code, Cong. & Ad.News, 3978, 3987 (1980). The Staggers Act requires the ICC to turn over to protestants, within five days of a request, the cost and revenue data upon which the protestants may make this evidentiary showing. The legislative scheme is clearly designed to provide prompt *and fair* resolution of rate disputes. Railroads may unilaterally publish tariff increases, but affected parties must be afforded a prompt opportunity to demonstrate the excessiveness of a particular surcharge. Such a scheme should prevent excessive unilateral surcharges from causing irreparable harm before the ICC could adjust them.[4]

■ Here, however, the petitioners have not had the opportunity which the statute intends them to have. An essential element of the surcharge standard allows recovery of the "reasonably expected cost of continuing service over the line." This is a new standard which Congress required the ICC to define within 120 days of the Act's passage (October 1, 1980). *See* § 10705a(b)(2). Although Congress provided an interim standard for this three-month period, it is inconceivable that such a temporary gap filler would become the standard. The "reasonably expected costs" standard is part of a crucial check on the new railroad rate-setting powers and is to be specially defined for those purposes. The ICC, however, had failed to adopt rules·defining this cost standard at the time of the ICG's surcharge in June of 1981—well beyond the time Congress mandated that such standards would be available. Thus, the petitioners could not even identify "reasonably expected costs," much less establish whether the surcharge would exceed such costs.

We think the rate issue should be remanded to the ICC for a hearing at which the petitioners and the ICG can offer evi-

---

4. According to the legislative history of the Staggers Act, Congress recognized that "[a] rapid change in the present law might * * * disrupt the national rail system." H.Rep.No. 96–1035, *reprinted in* 4 U.S.Code, Cong. & Ad. News, 3986 (1980). The stated intent is that the surcharge provision "establish a *moderate* procedure" by which railroads may achieve the minimum revenue standard set out in the Act. *Id.* [emphasis added].

dence with respect to the permissibility of the surcharge under the Staggers Act.[5] To the extent "reasonably expected costs" are a factor in this issue, the petitioners must have an opportunity to apply the standard for such costs that is adopted by the ICC through its rulemaking. The ICC has proposed such rules and received comments thereon, *see* 46 Fed.Reg. 9670 (1981), and has represented that promulgation of final rules is imminent. Thus, no significant delay should be occasioned by allowing the parties to apply such final rules to ICG's surcharge.

██ The ICG is enjoined from implementing the surcharge until such time as the foregoing hearing is held and the ICC makes a determination based upon the record developed at such hearing. This is not an order that the ICC suspend the surcharge, and we do not review the merits of any action by the ICC. The injunction is directed to the ICG and is based upon our narrow jurisdiction to review its surcharge. The ICG has never denied that its intent and the effect of its surcharge are to reduce traffic on the line or to render the abandonment proceeding moot. It has argued that such considerations are irrelevant to whether it may impose the surcharge. We agree that bad faith by the ICG does not prevent it from imposing a surcharge which meets the 110%/100% statutory standard. Such bad faith is highly relevant, however, to whether this Court should enjoin the surcharge to protect its jurisdiction until the ICC makes a determination as to the appropriateness of the surcharge. The petitioners have made a prima facie showing that the surcharge is an attempt to interfere with our jurisdiction over the abandonment matter. Any excessive amount of the surcharge could irreparably harm the petitioners and irreparably impair the mandate of this Court in the abandonment matter. On the other hand, the proceeding for which

we remand this matter should be a prompt one, such that any delay in collecting a legitimate surcharge would be minimal. The injunction is, therefore, necessary and proper. This case is hereby remanded for further proceedings consistent with this opinion.

---

5. Such hearing would, of course, address the applicability of the 110%/100% standard to the present surcharge. We note that one requirement for certain surcharges is that the railroad be earning "inadequate revenues" as defined in the Staggers Act. *See* § 10705a(b)(1)(A). Although the ICC has determined that ICG's revenues are inadequate,

*see* 364 I.C.C. 803, 826 (1981), the carrier has previously made somewhat contrary assertions. *See Railway Age*, Nov. 26, 1979 (quoted remarks of the chairman of ICG regarding the ICC's "error of describing ICG as a financially troubled railroad"). It is not necessary for us to review this issue on the present record.