720 F.2d 480
 ALLDREDGE GRAIN & STORAGE COMPANY; Allison Concrete
Products; B.J. Elevator, Inc.; Bass Elevator;
Chilliocothe Grain Company, Chula Coop., Coin Grain Corp.,
Davis County Agri Service; Essex Elevator; Farm Service
Company; Farmers Coop. Elevator; Imogene Grain; J & N
Fertilizer Co., Inc.; Johnson Brothers Mills; MFA,
Incorporated; Milbank Mills; Moore Fertilizer; Naples
Terminal Company, Ray-Carroll County Grain Growers, Inc.;
Randolph Fertilizer Company; Reed Seed Company; Riegel
Textile Corporation; St. Louis Grain Corporation;
Shenandoah Agri Service; Sure-Grow Plant Food; Tall Corn
Coop.; Van Buskirk Grain & Coal Co., and Votna Valley Grain
Company, Inc., Petitioners,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents.
 No. 82-2410.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Sept. 13, 1983.
Decided Oct. 28, 1983.
 
 Michael P. Casey, St. Louis, Mo., Thomas F. McFarland, Jr., Chicago, Ill., for petitioners; Lewis, Rice, Tucker, Allen & Chubb, St. Louis, Mo., Belnap, Spencer & McFarland, Chicago, Ill., of counsel.
 William F. Baxter, Asst. Atty. Gen., John J. Powers, III, Marion L. Jetton, Dept. of Justice, Washington, D.C., John Broadley, Gen. Counsel, Henri F. Rush, Associate Gen. Counsel, Sidney L. Strickland, Jr., I.C.C., Washington, D.C., for respondents.
 F. Blair Wimbush, Norfolk and Western Ry. Co., Roanoke, Va., for intervenor.
 Before LAY, Chief Judge, McMILLIAN, Circuit Judge, and DUMBAULD, Senior District Judge.*
 LAY, Chief Judge.
 
 
 1
 Petitioners[1] seek review of an Interstate Commerce Commission decision permitting Norfolk and Western Railway Company to collect a surcharge on traffic on its line. We affirm the decision of the Commission.
 
 
 2
 Norfolk and Western (N & W) is a railroad that has a line operating between Brunswick, Missouri and Omaha, Nebraska. On December 30, 1981, N & W filed with the Interstate Commerce Commission (ICC) a light density line[2] surcharge[3] of $191 per car on all traffic originating or terminating at N & W stations on the line. After seeking discovery of the underlying data used by N & W to calculate the surcharge, the petitioners sought a suspension of the surcharge and an investigation into its lawfulness.
 
 
 3
 The ICC did not suspend the surcharge but did institute an investigation into all issues relevant to the lawfulness of the schedules. The Commission, after considering all the evidence of record, found that the petitioners had not met their burden of showing that, after application of the surcharge, N & W's revenues would exceed 110 percent of N & W's variable cost of transporting traffic to and from the line plus the reasonably expected costs of continued operations.[4] Light Density Line Surcharge, 367 ICC 99 (1982). The Commission therefore found that the surcharge was valid.
 
 
 4
 Subsequent to the Commission's findings, petitioners sought a stay of that portion of the Commission's decision discontinuing the proceeding. The Commission denied the stay request but reopened the proceeding on its own motion to clarify several points in its order. Light Density Line Surcharge, No. 38799 (Nov. 29, 1982) (unpublished). Petitioners thereafter filed the present petition for review.
 
 
 5
 Under the Staggers Rail Act of 1980, P.L. No. 96-448, 94 Stat. 1895, a rail carrier is entitled to apply a surcharge if the revenue it receives from a line does not exceed 110% of the variable costs of transporting traffic to and from the line plus 100% of the reasonably expected costs of operating the line. 49 U.S.C. Sec. 10705a(b)(1)(A) & (b)(2) (Supp. V 1981). Petitioners argue that no substantial evidence exists to support the ICC's findings as to N & W's cost of operating the line.[5] Specifically, petitioners argue that land valuations supplied by N & W were unsubstantiated and should not have been relied upon by the ICC. Petitioners also argue that costs attributable to a forty-one mile section of the line were counted twice in the ICC's estimates of N & W's costs.
 
 
 6
 In Atchison, Topeka & Santa Fe Railway Co. v. Wichita Board of Trade, 412 U.S. 800, 806-07, 93 S.Ct. 2367, 2374, 37 L.Ed.2d 350 (1973), the Court observed:
 
 
 7
 Judicial review of decisions by the Interstate Commerce Commission in rate cases necessarily has a limited scope. Such decisions "are not to be disturbed by the courts except upon a showing that they are unsupported by evidence, were made without a hearing, exceed constitutional limits, or for some other reason amount to an abuse of power." Manufacturers R. Co. v. United States, 246 U.S. 457, 481 [38 S.Ct. 383, 389, 62 L.Ed. 831] (1918). As this Court has observed, "The process of rate making is essentially empiric. The stuff of the process is fluid and changing--the resultant of factors that must be valued as well as weighed. Congress has therefore delegated the enforcement of transportation policy to a permanent expert body and has charged it with the duty of being responsive to the dynamic character of transportation problems." Board of Trade of Kansas City v. United States, 314 U.S. 534, 546 [62 S.Ct. 366, 372, 86 L.Ed. 432] (1942).
 
 
 8
 The delegation to the Commission is not, of course, unbounded, and it is the duty of a reviewing court to determine whether the course followed by the Commission is consistent with its mandate from Congress.
 
 
 9
 In the instant case, the petitioners have failed to present specific evidence that would substantiate the alleged incorrect valuation and double counting. Petitioners rely on conclusory statements given by their witnesses in testimony and affidavits. Without a comparison between the allegedly incorrect figures and the figures on which petitioners rely, we cannot say that the Commission's findings were an "abuse of power." It is true that the ICC relied on figures supplied by N & W. However, with no substantiation of the petitioners' claim that those figures were unreliable, we cannot say that the ICC's conclusions are "unsupported by evidence."
 
 
 10
 The petitioners also allege that the standards used by the Commission in calculating reasonably expected costs were incorrect. Under the Staggers Act, Congress required the ICC to define within 120 days of the Act's passage, October 1, 1980, the "reasonably expected costs" of operating a rail line. 49 U.S.C. Sec. 10705a(b)(2) (Supp. V 1981). Congress provided standards that were to apply for the 120 day interim period. See id. The instant action was initiated after the expiration of the 120 day period but before the ICC issued its interpretation of "reasonably expected costs."[6] In deciding the instant action, the Commission used the interim standards.
 
 
 11
 The Commission states that it chose to apply the interim standards because their application produced a lower surcharge than would the application of the then pending official standards. In oral argument, the petitioners conceded this result but contended that our decision in City of Cherokee v. Interstate Commerce Commission, 671 F.2d 1080 (8th Cir.1982), requires that this court remand the case to the ICC for another hearing at which the permanent standards would be applied.[7]
 
 
 12
 In Cherokee, the court recognized that the Staggers Act set a minimum 110%/100% revenue standard that a railroad may seek to achieve through a surcharge. Because the ICC had refused to investigate the surcharge, no evidence was presented as to the railroad's reasonably expected costs and revenues. Therefore, the petitioners were unable to apply the 110%/100% standard and evaluate the surcharge. It was on this issue that the court held that the ICC should apply, on remand, the official standards for "reasonably expected costs" instead of the interim standards. The court emphasized the crucial role that the reasonably expected cost figure would play in the ICC's determination and the importance to petitioners of having a clear standard by which to measure the rail carrier's proposed surcharge.
 
 
 13
 This case differs from Cherokee in several respects. In Cherokee, no attempt had been made by the carrier or the ICC to substantiate reasonably expected costs. Therefore, the use of the new standards would be just as expedient as would the use of the interim standards. In the instant case, the ICC has already used the statutorily allotted time for reviewing the surcharge.[8] It has already made an accounting of N & W's reasonably expected costs and we find no public benefit in having it expend more resources on this issue.[9] Additionally, all parties were on notice during the proceedings that the ICC was using the interim standards in determining reasonably expected costs[10] and were apprised of the official standards when they were issued. Yet the petitioners do not argue that by using either of these standards N & W's revenues would exceed the 110%/100% standard. Finally, petitioners themselves concede that the use of the interim standards results in a lower surcharge than that which would result from the application of the new standards. We find no prejudice to the petitioners by the ICC's decision. The order of the Commission is affirmed.
 
 
 
 *
 The Honorable Edward Dumbauld, Senior United States District Judge for the Western District of Pennsylvania, sitting by designation
 
 
 [1]
 Petitioners are 28 companies that ship commodities via the Norfolk and Western line
 
 
 [2]
 A light density rail line is a line that "carried less than 3,000,000 gross ton miles of traffic per mile in the most recent calendar year for which traffic data is available." 49 U.S.C. Sec. 10705a(b)(1)(A) (Supp. V 1981)
 
 
 [3]
 The Interstate Commerce Act authorizes rail carriers "not earning adequate revenues" to collect surcharges on traffic originating or terminating on its line. 49 U.S.C. Sec. 10705a(b)(1)(A) (Supp. V 1981); see infra note 4
 
 
 [4]
 49 U.S.C. Sec. 10705a(b)(1) (Supp. V 1981) provides:
 Notwithstanding subsection (a) of this section--
 (A) a rail carrier not earning adequate revenues, as determined under section 10704(a)(2) of this title, may publish and apply a surcharge applicable to traffic originating or terminating upon any of its lines that carried less than 3,000,000 gross ton miles of traffic per mile in the most recent calendar year for which traffic data is available;
 Subsection 2 states:
 A rail carrier may apply a surcharge under this subsection if, prior to the application of such surcharge, that portion of the charges applicable to traffic to and from the line to which the surcharge applies and accruing to the surcharging carrier does not provide such carrier revenues adequate to cover--
 (A) 110 percent of such carrier's variable cost of transporting the traffic involved to or from such line; plus
 (B) 100 percent of such carrier's reasonably expected costs of continuing to operate such line, which shall include all costs necessary to sustain service on the line.
 
 
 [5]
 Petitioners argue that the burden of proving that the line qualifies for a surcharge is on the carrier once the ICC has instituted an investigation. The rail carrier does have the burden of originally showing that its line qualifies as a light density line producing inadequate revenues under 49 U.S.C. Sec. 10705a(b)(1) & (2) (Supp. V 1981). However, once the surcharge is properly applied, as it was in this case, the burden is on the shippers to show that the surcharge revenues exceed 110% of the carrier's cost of transporting traffic to and from the line plus 100% of the cost of operating the line:
 Upon petition of a shipper located upon a line to which a surcharge under this subsection is applied, the Commission may cancel the application of a surcharge under this subsection if such shipper demonstrates to the Commission that, after application of the surcharge, the surcharging carrier's revenues from all traffic originating or terminating upon the line to which the surcharge applies exceed 110 percent of such carrier's variable cost of transporting all traffic to or from such line plus such carrier's reasonably expected costs of continuing to operate such line.
 Id. at 10705a(b)(3)(A) (emphasis added).
 Petitioners rely on section 10701a(b)(2)(B)(ii) for support of their argument that N & W has the burden of proof. However, this section relates to initial rate setting by the rail carrier and is superseded by the more specific provision quoted above.
 
 
 [6]
 Reasonably Expected Cost, 365 ICC 819 (1982)
 
 
 [7]
 In Cherokee, the rail carrier applied for abandonment of its line. The ICC approved the application. On appeal, this court held that the ICC had used the wrong standards in determining whether abandonment was available to the carrier and remanded the case for further proceedings consistent with the correct standards. As the renewed abandonment proceedings were nearing completion, the rail company filed a surcharge of more than $1,000 per car for all traffic moving on its branch line (effectively doubling the cost of moving freight on the line). The ICC accepted the surcharge and refused petitioners' request to suspend and investigate it. This court asserted jurisdiction on the basis that the ICC's action substantially interfered with this court's earlier denial of the ICC's order allowing abandonment. See City of Cherokee v. ICC, 641 F.2d 1220 (8th Cir.1981)
 
 
 [8]
 49 U.S.C. Sec. 10707(b)(1) (Supp. V 1981) states:
 The Commission must complete a proceeding under this section and make its final decision by the end of the 5th month after the rate, classification, rule, or practice was to become effective, except that if the Commission reports to the Congress by the end of such 5th month that it cannot make a final decision by that time and explains the reason for the delay, it may take an additional 3 months to complete the proceeding and make its final decision.
 In the instant case, the Commission issued its decision on the last day of the three month extension.
 
 
 [9]
 The legislative history of the Staggers Act indicates Congress's concern that drawn out proceedings relating to costs would hinder the effectiveness of the Act:
 [T]he Commission [should] not ... permit cost debates to delay the policy of this Act that carriers earn the full and reasonably expected costs of providing service on [light density] lines.... Only if carriers are able to cover all these costs can they expect to begin to invest to provide the service on which our nation's commerce depends.
 Conference Report, H.R.Rep. No. 96-1430, 96th Cong., 2d Sess. 112, reprinted in 1980 U.S.Code Cong. & Ad.News 3978, 4144.
 
 
 [10]
 In its decision, Light Density Line Surcharge, 367 ICC 99 (1982), the ICC stated that it would apply the interim standards because the application of the new standards would produce higher costs to N & W, resulting in a higher allowable surcharge. Id. at 102