

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-17-2002

# Comm of PA v. Surface Transp Bd

Precedential or Non-Precedential: Precedential

Docket No. 01-3685

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Comm of PA v. Surface Transp Bd" (2002). *2002 Decisions.* Paper 281.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/281

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

        Filed May 17, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-3685

THE COMMONWEALTH OF PENNSYLVANIA
and SENATOR ARLEN SPECTER,
        Petitioners

v.

SURFACE TRANSPORTATION BOARD
and UNITED STATES OF AMERICA,
        Respondents

        *Norfolk Southern Corporation and
         Norfolk Southern Railway Company,
        Intervenors/Respondents

        *Transport Workers Union of America, National
        Conference of Firemen and Oilers/SEIU,
        International Association of Machinists &
        Aerospace Workers, International Brotherhood
        of Boilermakers and Blacksmiths, International
        Brotherhood of Electrical Workers, Sheet Metal
        Workers' International Association, and
        Transportation Communications International
        Union,
        Intervenors/Petitioners

*(Pursuant to Court Order dated 11/2/01)

On Petition for Review of An Order of
The Surface Transportation Board
(No. 33388)

Argued February 5, 2002

Before: SLOVITER and AMBRO, Circuit Judges,
and POLLAK, District Judge**

(Filed: May 17, 2002)

        Scott N. Stone (Argued)
        Patton Boggs
        Washington, D.C. 20037

         Attorney for Petitioner
Commonwealth of Pennsylvania

        Arlen Specter (Argued)
         United States Senator
        United States Senate

Washington, D.C. 20510

        Attorney for Petitioner
Arlen Specter

        Theodore K. Kalick (Argued)
        Ellen D. Hanson
         General Counsel
        Craig M. Keats
         Deputy General Counsel
        Surface Transportation Board
        Office of General Counsel
        Washington, D.C. 20423

_____

** Hon. Louis H. Pollak, Senior United States District Judge for the
Eastern District of Pennsylvania, sitting by designation.

                              2

        John P. Fonte
        Robert B. Nicholson
        Charles A. James
         Assistant Attorney General
        United States Department of Justice
        Antitrust Division
        Washington, D.C. 20530

         Attorneys for Respondents
        Surface Transportation Board and
        United States

        Carter G. Phillips (Argued)
        G. Paul Moates
        Jeffrey S. Berlin
        Virginia A. Seitz
        Sidley Austin Brown & Wood
        Washington, D.C. 20005

        Richard A. Allen
        Scott M. Zimmerman
        Adam F. Hulbig
        Zuckert, Scoutt & Rasenberger
        Washington, D.C. 20006

        J. Gary Lane
        Henry D. Light
        Joseph C. Dimino
        George A. Aspartore
        Jeffrey H. Burton
        John V. Edwards
        Norfolk Southern Corporation
        Norfolk, Virginia 23510

         Attorneys for Norfolk Southern
        Corporation and Norfolk Southern
        Railway Company,
        Intervenors/Respondents

Richard S. Edelman (Argued)
O'Donnell, Schwartz & Anderson
Washington, D.C. 20036

Attorney for the Unions
Intervenors/Petitioners

OPINION OF THE COURT

SLOVITER, Circuit Judge:

The Commonwealth of Pennsylvania and Arlen Specter,
one of the United States Senators from Pennsylvania, joined
by various interested unions,[1] petition this court for review
of the decision of the Surface Transportation Board ("STB"
or "Board") rejecting their petition to cancel the planned
shutdown by Norfolk Southern ("NS")[2] of its Hollidaysburg
Car Shops ("HCS") located outside Altoona, Pa.

Before the Board, petitioners relied primarily on the
representations condition that the Board had imposed on
NS requiring it to "adhere to all of the representations" NS
had made during the course of the proceeding by which it
received approval to acquire Conrail properties, including
the HCS. It will be evident to anyone who reviews the
record that in the course of seeking the Board's approval of
NS's acquisition of a portion of Conrail, which included the
Hollidaysburg Car Shops, NS had represented before the
Board and to various affected constituencies that it would
keep the HCS open, that as a result NS was able to garner
support from the Commonwealth, Senator Specter and
others, that these supporters understood that the HCS
would remain operational for more than two years, but that
NS announced plans to close the HCS in less than that
time, and that only the stay imposed by this court pending
decision on this petition for review has kept the HCS open.
Although the Board found that NS had represented that
"the heavy repair shop at Hollidaysburg would continue to
be utilized," the Board declined to cancel the shutdown,

_____

1. The intervening unions are Transport Workers Union of America,
National Conference of Firemen and Oilers/SEIU, International
Association of Machinists and Aerospace Workers, International
Brotherhood of Boilermakers and Blacksmiths, International
Brotherhood of Electrical Workers, Sheet Metal Workers' International
Association, and Transportation Communications International Union.

2. Norfolk Southern Corporation and Norfolk Southern Railway Company
participated as intervenors in this appeal.

concluding that NS's representations did not require
continued operation in the face of "deteriorating economic
conditions." It is from this order that petitioners seek

review. We regret that on this record this court is powerless to grant the petitions.

I.

FACTS & PROCEDURAL POSTURE

The Surface Transportation Board is the independent federal agency established by Congress within the Department of Transportation and has the responsibility for the economic regulation of the country's railroads. [3] The Board has exclusive authority over the approval and supervision of railroad mergers. See, e.g., 49 U.S.C. S 11321 (2001); Union R.R. v. United Steelworkers of America, 242 F.3d 458, 466 (3d Cir. 2001).

Congress has prescribed a number of factors for the Board to consider in the exercise of its authority to approve mergers. Those factors include the merger's effect on the adequacy of transportation available to the public, the impact on the public interest of the inclusion or exclusion of other carriers, the total fixed charges from the merger, the interest of the railroad employees affected by the merger, and the effect of the merger on competition between rail carriers. 49 U.S.C. S 11324(b). Thus it was to the Board that the prospective acquirers of Conrail looked for ultimate approval.

Initially, two railroad companies, Norfolk Southern Corporation and Norfolk Southern Railway Company

---

3. See Marshall J. Breger & Gary J. Edles, Established by Practice: The Theory and Operation of Independent Federal Agencies , 52 Admin. L. Rev. 1111, 1288 (2000) (citing 49 U.S.C. SS 701-706, 721-27 (Supp. IV 1998)). "The STB is the successor agency to the Interstate Commerce Commission (ICC), which was abolished by Congress in 1995. That act also established the STB, and provided that it would perform all the functions that previously were performed by the ICC as of the effective date of the act." Friends of the Atglen-Susquehanna Trail, Inc. v. Surface Transp. Bd., 252 F.3d 246, 250 n.1 (3d Cir. 2001) (citations omitted).

(collectively "NS") and CSX Corporation and CSX Transportation, Inc. (collectively CSX), had battled over the extent to which either entity would acquire Conrail, with each company publicly insisting its acquisition of Conrail would better serve the interests of influential constituencies. For example, both CSX and NS suggested they would consider moving their headquarters to Philadelphia. Henry J. Holcomb, Norfolk Southern Launches Hostile Bid for Conrail, Phila. Inquirer, Oct. 24, 1996. According to commentators, winning the congressional support of the Pennsylvania delegation was a key component of NS's strategy. See, e.g., Don Phillips, Norfolk Southern Tops CSX's Bid for Conrail; $9.1 Billion Offer is Likely to Start a Messy Battle, Wash. Post, Oct. 24, 1996, at E1. Bud Shuster, Altoona's U.S. Congressman, and

then-chairman of the House Transportation and Infrastructure Committee, announced he would "launch[ ] a 'bloody, bruising legislative battle' if need be to protect the 1,300 jobs [at Conrail's Altoona-area shops]." Tom Gibb, Bud Shuster Vows to Fight to Protect Railroad Jobs , Pittsburgh Post-Gazette, Nov. 2, 1996, at C-5.

During this period and after it joined forces with CSX to seek approval of the Conrail transaction, NS made a number of representations regarding the Hollidaysburg Car Shops, located near Altoona, Pennsylvania. NS's CEO, David Goode, publicly stated that "Conrail's locomotive and car repair shops, which make up the lion's share of the economy of Altoona, Pa., would grow under Norfolk Southern." Holcomb, supra. NS bought advertising in the New York Times representing that "Norfolk Southern is committed to continuing to operate Conrail's Hollidaysburg Car Shop . . . and will promote employment there." App. at 358. NS issued a press release to the same effect. In a fact sheet issued around the time NS filed its Conrail application, NS indicated its intent to invest an " '[e]stimated $4 million in capital improvements at [the] Hollidaysburg shop.' " CSX Transp. & CSX Transp., Inc., STB Fin. Docket No. 33388, slip op. at 5 (STB May 21, 2001) (hereinafter Decision No. 186) (alterations in original).

However, when Goode testified before a subcommittee of the U.S. Senate's Committee on Appropriations, he stated

only that "we are in a position of not only being able to give assurances that we will keep [the Hollidaysburg and Altoona shops] and keep them operating, we are going to need them." Conrail Merger Implications: Hearing Before a Subcomm. of the Senate Comm. on Appropriations, 105th Cong. 49 (1998) (statement of David R. Goode, President and CEO, Norfolk Southern). But then-influential Representative Shuster reported that he had received "strong verbal reassurances that the [Altoona-area] shops will remain . . . at least at the current level." Gibb, supra.

In its application before the STB, NS observed that the Altoona/Hollidaysburg shops were "excellent,""while NS's comparable facilities are in Roanoke, Virginia." App. at 378. According to NS, "important efficiencies can be gained by concentrating different types of mechanical work at each location." Id. NS concluded by noting that " 'insourcing' provides another opportunity to maximize utilization of the system shops at Altoona/Hollidaysburg and Roanoke. .. . CSX plans to use NS's services at Altoona/Hollidaysburg for at least a portion of its Conrail car and locomotive fleets." Id. NS indicated it would market the services offered by the HCS in order to expand the opportunities there. Decision No. 186, slip op. at 5. In the operating plan NS submitted as part of the merger approval process, NS again represented it would invest four million dollars in capital improvements to the HCS.

Representative Shuster, Pennsylvania's then-Governor Ridge, and the Pennsylvania Senate and House Transportation Committees all expressed support for NS's acquisition of Conrail, explicitly founding their support on the representations made by NS regarding the Hollidaysburg shop. Decision No. 186, slip op. at 6; CSX Transp. & CSX Transp., Inc., 3 S.T.B. 196 (Decision No. 89) Appendix K, slip op. at 321 (July 20, 1998) (hereinafter Decision No. 89). On July 20, 1998, the STB approved the acquisition and division of Conrail by NS and CSX.

The Board "approv[ed] the primary application in its entirety," Decision No. 89, slip op. at 17, observing the application was "endorsed by more than 2,700 parties, including more than 2,200 shippers, more than 350 public officials, and more than 80 railroads," id. at 12. The Board

found that the merger, as conditioned by its decision approving the transaction, "is consistent with the public interest; (b) . . . the . . . transaction will not adversely affect the adequacy of transportation to the public; (c) . . . failure to include other railroads will not adversely affect the public interest; . . . [and] (e) . . . the interests of employees affected by the proposed transaction do not make such transaction inconsistent with the public interest, and any adverse effect will be adequately addressed by the conditions imposed." Id. at 166.

The statute gives the Board the authority to "impose conditions governing" merger authorizations. 49 U.S.C. S 11324(c). The Board has "extraordinarily broad discretion" under that section to fashion conditions to such transactions to ensure that the public interest standard is satisfied. S. Pac. Transp. Co. v. ICC, 736 F.2d 708, 721 (D.C. Cir. 1984); see also Grainbelt Corp. v. Surface Transp. Bd., 109 F.3d 794, 798 (D.C. Cir. 1997).

In approving the merger, the Board imposed a number of conditions on NS and CSX. The condition of relevance here provided that "Applicants must adhere to all of the representations they made during the course of this proceeding, whether or not such representations are specifically referenced in this decision." Decision No. 89, slip op. at 176. The Board reiterated this condition a number of times in its decision. See, e.g., id. at 105 ("[Certain parties seeking the imposition of conditions] . . . ask that we 'note for the record' the settlement agreement they have entered into with NS. As we have noted elsewhere in this decision, we are requiring applicants to adhere to any representations made to parties in this case."); id. at 17 n.26 ("CSX and NS have made, both in their written submissions and also at the oral argument . . . numerous representations to the effect that certain issues will be addressed, certain services will be provided, and so on. Some of these representations are specifically referenced in this decision; many however, are not specifically referenced. We think it appropriate to note, and to emphasize, that

CSX and NS will be required to adhere to all of the representations made on the record during the course of this proceeding, whether or not such representations are specifically referenced in this decision.").

On June 1, 1999, following the approval by the Board of the Conrail split, NS began operating various Conrail lines. In November of 2000, less than a year and a half after it began operating the HCS, NS announced its intention to close that facility. Congressman Shuster, who asserted that he had been given personal assurances by NS that the HCS would be retained, scheduled hearings on the matter. NS's CEO then advised Shuster via letter that it would not continue with the planned closure. Shortly thereafter, in January 2001, Shuster resigned, "saying he did not want to serve after being removed as chairman of the powerful Transportation Committee because of GOP term limits." Shuster Name Will Remain in Congress, Lewistown Sentinel (May 16, 2001), at http://www.lewistownsentinel.com /news_05161.htm. On February 21, 2001, NS announced the closure of the HCS, effective approximately September 1, 2001.

Promptly thereafter, the unions and the Commonwealth of Pennsylvania filed petitions to the Board seeking an order barring the closure. The Board ultimately issued three decisions in response to the petitions. First, the Board issued Decision No. 186 on May 21, 2001, "directing . . . [NS] to show why the Board should not order NS to cancel a proposed shut-down of its Hollidaysburg Car Shops and to keep them open at least at present capacity for a significant period of time beyond September 1, 2001, in view of representations made in the Conrail proceeding, or made elsewhere, upon which involved parties clearly relied in formulating positions of support for the Conrail transaction." Decision No. 186, slip op. at 1.

The Board found that NS had "indicated" that"the heavy repair shop at Hollidaysburg would continue to be utilized." Id. at 5. According to the Board, "[t]hroughout the course of the Conrail proceeding, NS indicated on numerous occasions that it was committed to operating the Hollidaysburg Car Shops." Id. The Board found that "NS's representations vis-a-vis the Hollidaysburg Car Shops were intended to be relied upon, and were relied upon, in connection with the positions taken by various parties in the Conrail proceeding." Id. at 6. Thus, the Board observed, "in the present circumstances, the customary flexibility that

we accord the projections of merger applicants must give way to the representations by NS to keep the Hollidaysburg Car Shops open and operating -- statements upon which people clearly relied in formulating positions of support for the Conrail transaction." Id. at 7. The Board concluded by

stating that "[t]he Board takes very seriously statements and comments made by parties in all matters that come before us. We will continue to be vigilant in doing what we can to ensure that representations made by parties to our proceedings are actually honored." Id.

Petitioners rely particularly on the following statements in Decision No. 186. First, the Board observed,"[w]e agree that NS never committed to keeping the shops open in perpetuity, but it is now only 2 years since the date . . . on which Conrail's assets were divided between CSX and NS." Id. at 6. The Board also suggested that the representations condition would not be waived based on new events that were foreseeable to NS at the time it made its representations: "Regarding NS's claim that it now has excess freight car repair capacity, if NS does indeed have excess freight car repair capacity today, this is an excess that could have been considered in 1997-1998 when commitments were made." Id. at 6-7.

Commissioner Burkes dissented from the Board's decision, complaining that the Board had never before strictly enforced a "representations condition." Id. at 9. Commissioner Burkes cited examples where, notwithstanding a similar condition, the Board had not required former merger applicants to strictly comply with their earlier representations to make certain investments. He noted that the Board encouraged NS to deviate from its operating plan in Buffalo, New York by changing its operations there and making the considerably greater investment of $12 million than that it had originally anticipated. Indeed, Burkes observed that, in retrospect, "perhaps, the Board should have only allowed NS to spend only $8 million in Buffalo and require it to spend $4 million in Hollidaysburg." Id. In another proceeding, the Board had not required Union Pacific to make investments it had represented it would make because the Board "recognized 'there is no requirement that a merger applicant actually

10

make investments in the exact places or at the precise dollar amount that it predicts it will spend in its application.' " Id.; see also Union Pacific Corp., STB Fin. Docket No. 32760 (Sub-No. 21), slip op. at 13 (Dec. 13, 2000) (same).

Commissioner Burkes could discern no difference between the enforcement of investment representations and the enforcement of a representation to maintain HCS. Burkes concluded that "strict enforcement of the 'representations condition' would be a new standard that should not be applied retroactively to NS or to any other railroad. . . . If the Board intends this to be a new standard, then it should be addressed in our new railroad merger rules which will be issued shortly by the Board." Decision No. 186, slip op. at 10.4

Four months later, in Decision No. 198, issued

September 18, 2001, the Board denied the petition to order NS to keep the HCS open. CSX Transp. & CSX Transp., Inc., STB Finance Docket No. 33388, slip op. at 1, (STB Sept. 18, 2001) (hereinafter Decision No. 198). The Board observed that "deteriorating economic conditions" had forced NS to scale back its ambitions on a number of fronts, including a reduction in its dividend for the first time in its history, a 25% reduction in its management workforce, and a contraction of its fleet by 12,000 rail cars. Id. at 2 & n.4. Furthermore, the Board noted NS's contention that, when analyzed as a stand-alone facility, the HCS was losing up to seven million dollars annually. Id. at 3. Keeping open the HCS might also require NS to shut down other facilities. "[F]avoring the HCS and its employees

_____

4. An additional instance, not cited by Commissioner Burkes but pointed to by the United States in its brief, is the Board's decision in CSX Corp. & CSX Transp., Inc., STB Fin. Docket No. 33388, Decision No. 5, 2001 STB LEXIS 67, at *49-50 (STB Feb. 2, 2001). In that Decision, the Board rejected an objection to CSX's failure to implement"commitments" outlined in its operating plan, observing, "The plans . . . are applicants' best projections regarding what traffic they believe they can profitably serve. Those operating plans do not provide a basis in and of themselves for relief at this time." Id. at *49-50. In short, the plans need not be "enforced without variation." Id. at 49.

11

could work to disfavor other NS employees and locations." Id. at 7.

On the other hand, the Board observed that NS had "presented nothing here to change our prior conclusion that the carrier's representations both before and during the merger process could not help but reasonably lead State and local interests to believe that NS would keep the shops open and to rely on that commitment in determining how they participated in the merger process." Id.  at 6. In light of the reliance on NS's representation to keep the HCS open, the Board "supplement[ed] the labor protective conditions . . . imposed in Decision No. 89." Id. at 7.

In its final decision, Decision No. 200, issued on October 4, 2001, the Board rejected the request by the Commonwealth and the unions for a stay pending judicial review. CSX Corp. & CSX Transp. Inc., STB Fin. Docket No. 33388, slip op. at 1 (STB Oct. 4, 2001) (hereinafter Decision No. 200). There, the Board observed that in Decision No. 198, "we . . . determined that NS did not represent that it would keep the HCS open indefinitely, without regard to business and economic conditions." Id. at 2.

The petitioners filed this petition for review. They sought, and we granted, a stay. At NS's request, we expedited the proceeding.

II.

JURISDICTION

This court has jurisdiction to review the Board's decisions pursuant to 28 U.S.C. S 2342(5) (2001). The petition for review was timely filed.

III.

DISCUSSION

Petitioners raise two issues in this case. They contend (1) that the Board's decision under review was arbitrary and capricious, and (2) that the Board's decision was

12

unreasonable and standardless and/or constituted an abuse of its discretion. The standard of review is established by the Administrative Procedure Act (APA), 5 U.S.C. S 706(2)(A) (2001), which provides that the reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be 2 (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

Petitioners do not, nor could they reasonably, argue that the Board's decision not to enjoin NS from closing the HCS is not in accordance with law. Congress committed to the Board the exclusive authority to approve and authorize consolidations or mergers of rail carriers, and this authority encompasses supervision of those mergers. 49 U.S.C. S 11321.

There is no contention that the Board failed to follow the required procedures. Instead, petitioners argue that the Board's decision was arbitrary and capricious. They list six reasons why it should be so characterized. They are that the decision fails to show a rational connection between the facts found and the choice made, the Board relied on irrelevant factors, it failed to articulate a standard governing when railroad merger applicants will be held to their promises, it failed to explain why the adverse events cited were not foreseeable, it failed to treat its decision as to the HCS as a departure from its earlier policy holding NS and other merging railroads to all of their promises and representations, and it failed to consider relevant and important factors.

Where the Board is interpreting and applying conditions it has promulgated according to its statutory authority, its action is accorded the highest deference. See, e.g., CSX Transp., Inc. v. Surface Transp. Bd., 75 F.3d 696, 702 (D.C. Cir. 1996) ("The [Board]'s decision interpreting the conditions that it announced in Oregon Short Line is entitled to considerable deference, 'even greater deference' than when an agency interprets a statutory term.") (citation omitted); Nat'l Motor Freight Traffic Ass'n v. ICC, 590 F.2d 1180, 1184 (D.C. Cir. 1978) ("We accord particular deference when, as here, the subject of review is the

agency's interpretation . . . of its own order."). Notably, the

Board's imposition of conditions to mergers has been characterized as the kind of " 'judgmental or predictive' conclusion with respect to which judicial deference to agency expertise is especially appropriate." S. Pac. Transp. Co. v. ICC, 736 F.2d 708, 720-21 (D.C. Cir. 1984) (citation omitted). Given the Board's "extraordinarily broad discretion to impose . . . conditions" pursuant to a merger "the courts have appropriately given the [Board's] selection of such conditions great deference." Id. at 721. In determining whether the Board was arbitrary and capricious in its interpretation of such a condition, our review is particularly deferential, implicating, as it does, both the Board's expertise in imposing the condition and our customary deference to an agency's interpretations of directives which it has itself promulgated.

It is evident that at the heart of the petitioners' argument is their position that the representations condition that the Board imposed on NS in Decision No. 89 bound NS to the representations it made to keep the HCS open. Therefore, before considering the petitioners' contention that the Board failed to apply the representations condition, it is necessary to determine the nature of NS's representations. Although the representations condition in Decision No. 89 by its terms covers only "representations made on the record during the course of this proceeding [the Conrail acquisition]," neither the Board nor the parties have suggested that there is a significant distinction between the on-the-record representations and the representations made by NS in public statements and advertisements in the course of its campaign to seek Board approval of the Conrail acquisition.

Petitioners conceded at oral argument before us that NS never said that it committed to operate the HCS in perpetuity. Transcript of Oral Argument February 5, 2002 at 12 (hereinafter Tr.). Nor have they pointed us to any commitment to operate the HCS for any defined time. Instead of identifying any specific statement or representation, petitioners' counsel referred us to the body of statements made by NS referred to above. Mr. Edelman, counsel for the unions, stated:

> [I]t's the press release. It's the statement to Senator Specter. It's the statements to the Governor. It's the statements to Congressman Shuster. It's newspaper ads all over the State that they took out, ["]dear employees,["] you know.

Tr. at 19.

The Board has accepted both the contentions that NS

made representations and that these representations were covered by the representations condition that the Board imposed. In Decision No. 186, which required NS to show cause why the Board should not cancel the announced HCS shut-down, the Board referred to "NS's representations vis-a-vis the Hollidaysburg Car Shops." However, the Board did not describe the nature of NS's representation or "its commitment" other than in vague terms. For instance, it observed that "in the present circumstances, the customary flexibility that we accord the projections of merger applicants must give way to the representations by NS to keep the Hollidaysburg Car Shops open and operating ." Decision No. 186, slip op. at 7 (emphasis added). In addition, the Board used language that appeared to reject NS's proffered explanations for the shut-down, stating, "[W]e cannot accept, without further explanation, the implicit argument that NS's commitments vis-a vis the Hollidaysburg Car Shops were intended to remain in effect only as long as the economy remained as it was at that time. Regarding NS's claim that it now has excess freight car repair capacity, if NS does indeed have excess freight car repair capacity today, this is an excess that could have been considered in 1997-1998 when commitments were made." Id. at 6-7.

In response to the direction to show cause in Decision No. 186, NS argued that deteriorating economic conditions forced it to rethink its operations and to take various steps to reduce costs, increase efficiency, and restructure the company to enable it to perform profitably. Among those steps, but far from the only one, was the closure of the HCS, which NS reported had lost almost seven million dollars in the year 2000.

Referring to these changed economic conditions, the Board, less than four months afer Decision No. 186, issued

15

Decision No. 198, in which it held it would not require NS to keep the HCS open after the announced closing date of October 1, 2001. In so holding, the Board did not backtrack on its prior acknowledgment that NS had made representations. After reviewing the petitioners' arguments (which are substantially the same as those before us) and the positions of other interested entities, the Board began its Discussion section with the statement:

> It is evident that, during the course of and in connection with the Conrail proceeding, NS made a general commitment to the Altoona/Hollidaysburg area and to the employees of the HCS and the JLS [nearby Juniata Locomotive Shop] that it would make these shops an important part of its post-transaction operations.

Decision No. 198, slip op. at 6. The Board described the commitment as follows:

This commitment was, in essence, both a commitment to the future economic well-being of the area and a commitment to the well-being of the individual employees of the HCS and the JLS, and it is supported by statements in the record and confirmed by other representations made by NS officials at the highest levels. NS has presented nothing here to change our prior conclusion that the carrier's representations both before and during the merger process could not help but reasonably lead State and local interests to believe that NS would keep the shops open and to rely on that commitment in determining how they participated in the merger process. Decision No. 186 at 6.

Id. (citation omitted). Finally, on the nature of the commitment the Board concluded that "NS kept its commitment by operating the HCS and the JLS" for more than two years. Id.

Petitioners sought a stay pending judicial review. In Decision No. 200, which was the Board's final word on the subject of the representations made, the Board described Decision No. 198 as "determin[ing] that NS had indeed made commitments to the Altoona/Hollidaysburg area and to HCS employees -- which were relied upon by various

local and statewide interests in determining how they would participate in the merger process -- that NS would make the HCS and the nearby Juniata Locomotive Shop (JLS) important parts of its post-transaction operations." Decision No. 200, slip op. at 2. Significantly, the Board stated that the "sole issue before us [in Decision No. 198] was whether NS violated our condition that the carrier adhere to its representations, and we found no indication in the record of the Conrail proceeding, or elsewhere, that NS had represented that it would continue HCS operations irrespective of changing business conditions." Id. at 3 (emphasis added).

Our review of the record leads us to the same conclusion. Although officials of the Commonwealth, the local communities, the employees, and influential public figures, such as Senator Specter, may have been led to understand otherwise, we can find no representation by NS that it intended to operate HCS indefinitely without regard to business conditions. A careful parsing of the statements by NS on the record shows it made a number of disclaimers during the application process. For example, NS had stated, "Applicants have not determined whether any other locomotive or car shops or facilities, other than the ones specified in the Operating Plan, will be closed." App. at 848. In its operating plan, NS observed, "The Operating Plans are best projections, which are not binding on the Applicants. . . . These plans . . . cannot anticipate all of the changes that may be necessary to operate Conrail's assets in an efficient manner." App. at 848. NS further stated, "After NS acquires its portion of Conrail, business

conditions, revenue and traffic growth, efficiency of operations and similar factors will be evaluated to determine needs for car and locomotive shops. No timetable has been set for this determination." App. at 848.

The commitment, as NS now asserts, was a general one. Counsel for the Commonwealth conceded that there is a mechanism in which a representation such as that made in this case could have been included in a legally binding commitment. Tr. at 6-7. In fact, there was a written agreement between NS and the Commonwealth in which NS undertook certain action but that agreement did not cover

17

the HCS. Thus, the events that precipitated the petitions before us may serve as an object lesson to other states and communities.

The Board was not arbitrary in concluding that the representations condition did not bind NS to its commitment to make the HCS an important part of its post-transaction operations. It follows that the arguments that petitioners make that are premised on their contention that the Board was arbitrary in failing to require NS to comply with its representations with respect to the HCS necessarily fail in light of our determination that the Board was not arbitrary in determining that NS fulfilled its representations under the circumstances before it.

However, the petitioners also argue that the Board considered irrelevant factors in reaching its decision and, correlatively, that it failed to consider other relevant and important factors. This argument merits careful attention because administrative agencies have an obligation to act only after consideration of all relevant factors. See, e.g., Motor Vehicle Mfrs.' Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (observing an agency acts arbitrarily and capriciously when it "relie[s] on factors which Congress had not intended it to consider [or] entirely failed to consider an important aspect of the problem"); see also Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971) (observing that to determine whether an agency has acted arbitrarily and capriciously, "the court must consider whether the decision was based on a consideration of the relevant factors").

The Board was cognizant of the adverse effect that the closure of the HCS would have on the HCS employees. To ameliorate the harsh effects of the closure of the HCS, the Board imposed labor protective conditions in addition to those that ordinarily accompany approval of a merger. When the Board authorizes a merger it is required by statute to safeguard the interests of railroad employees who are adversely affected by the transaction. 49 U.S.C. S 11326. The standard labor protections that the Board imposed are the conditions set forth in New York Dock Railway-Control-Brooklyn Eastern District Terminal , 360 I.C.C. 60, 84-90 (1979). The New York Dock conditions

entitle employees who are transferred as a result of the transaction to reimbursement for moving expenses and losses from the sale of a home, and up to six years of income protection for those employees who are displaced or dismissed. Id. at 84, 86-88. In exchange for these benefits, rail carriers may transfer work and employees as necessary to carry out the transaction notwithstanding existing labor agreements, although "rates of pay, rules, working conditions and all collective bargaining and other rights, privileges and benefits . . . under applicable laws and/or existing collective bargaining agreements . . .[are] preserved unless changed by future collective bargaining agreements." Id. at 84. In order for an affected employee to obtain benefits under New York Dock in the event of a dispute, s/he must establish that the adverse effect was caused by the Board-approved transaction itself, and not by some other event. Id. at 88.

In this case, the Board supplemented the standard New York Dock conditions that it had imposed on the Conrail transaction "by providing that current HCS employees who are not afforded the opportunity to transfer to new employment elsewhere on NS, or cannot exercise their seniority to obtain such a position, will be deemed to be eligible, upon dismissal, to New York Dock's economic benefits." Decision No. 198, slip op. at 7-8. In other words, the Board dispensed with the standard New York Dock requirement that employees establish that the transaction caused their dismissal or displacement. The Board also extended "automatic certification" for New York Dock benefits to all transferring HCS employees. Moreover, in response to the unions' argument that the Board imposed only that which NS had already offered, NS notes that it had only previously offered the New York Dock conditions to a few of the unions but that the Board directed that they be provided to all of the unions. Tr. at 44.

The petitioners acknowledge the ameliorative effect of the labor conditions but argue that the adverse effect of the shut-down would be heavily felt on the state and on the Hollidaysburg/Altoona community. NS notes that it undertook to make certain investments within Pennsylvania, such as committing, inter alia, to provide

cash to the city and state to attract Kvaerner ASA to the Philadelphia Navy Yard, to invest in rail development programs in Philadelphia and throughout Pennsylvania, to create certain rail-related jobs, to make over $235,000,000 of capital improvement expenditures in Pennsylvania, to extend a trackage rights agreement with SEPTA for five years, and to participate in civic and charitable affairs in the state. As to the community most affected, the Board responds that it required NS to continue to address the

needs of the Hollidaysburg/Altoona area and help to ease the community's loss by seeking alternative economic uses for the HCS property as well as continuing efforts to maintain operations at the nearby JLS.

Admittedly, the requirements that NS assist in the Hollidaysburg/Altoona area are vague, and there is no assurance that they will even partially make up for the loss of the HCS. But it is not our function to decide what steps, if any, should have been required of NS. Instead, we are limited to reviewing that which the Board did, and we cannot hold that the Board's determination that the financial difficulties in which NS found itself, the general worsening of the economy, and the absence of work at the HCS were not adequate reasons to permit NS to make the management decision to terminate operation of the HCS. The Board was obviously entitled to consider the economic condition of NS because the survival of NS as a viable enterprise has an impact on factors the Board is statutorily obligated to consider, such as the merger's effect on the adequacy of transportation available to the public and the effect of the merger on competition between rail carriers. 49 U.S.C. S 11324(b). Moreover, although public interest is a factor to be considered in the Board's decisions, that interest can extend beyond the boundaries of any one state.

The final issue to which petitioners direct their fire, and one that also elicited the concern of a Board member, is a legitimate one and goes to the heart of administrative agency decisionmaking. The petitioners, citing decisions from this court, the Supreme Court and learned treatises, argue that agencies must apply consistent standards and principles to insure the fairness of the administrative process. See, e.g., Chisholm v. Def. Logistics Agency, 656

20

F.2d 42, 47 (3d Cir. 1981) (observing "agencies[acting as quasi-judicial bodies] . . . have an obligation to render consistent opinions and to either follow, distinguish or overrule their own precedent"); Greater Boston Television Corp. v. FCC, 444 F.2d 841, 852 (D.C. Cir. 1971) (observing "an agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored"); Atchison, Topeka & Santa Fe Ry. v. Wichita Bd. of Trade, 412 U.S. 800, 808 (1973) (noting that agency has "duty to explain its departure from prior norms"); see also II Kenneth Culp Davis & Richard J. Pierce, Jr., Administrative Law Treatise S11.5, at 204 (3d ed. 1994) (noting that agencies that fail to adequately explain their departures from precedent act arbitrarily and capriciously).

Petitioners argue that in this case the Board failed to render consistent opinions, as, according to them, Decision No. 198 is not consistent in either tone or result with Decision No. 186, rendered four months earlier.

At least one commissioner expressed some concern about

the manner in which the Board interpreted its
representations clause. Vice-Chairman Clyburn commented
at the conclusion of Decision No. 198 that "the Board
should be clear on how it views the nature of the
'representations clause.' "5 He asked whether this clause

_____

5. Vice-Chairman Clyburn's relevant comments read:

> Is [the representations] clause a catchall phrase stating merely a
> goal for which to strive? Does it indicate a hard and fast rule to be
> interpreted literally, with no exceptions or consideration of
> extenuating circumstances? Maybe the interpretation of the
> representations clause depends on the specific wording of the
> representation or the context in which it is given. Further do we
> generally afford more flexibility to representations regarding matters
> of the operating plan or long term expenditures (because of the
> tentative nature of such projections), yet are more strict in our
> construction when dealing with specific services to particular
> customers? While I understand the conclusion the Board reaches in
> this difficult case, the Board, particularly in light of the importance
> of merger issues in this new paradigm, should give more guidance
> on how it interprets its own ordering paragraph.

Decision No. 198, slip op. at 9.

was "a catchall phrase stating merely a goal for which to
strive?" or whether "it indicate[s] a hard and fast rule to be
interpreted literally, with no exceptions or consideration of
extenuating circumstances?" Vice-Chairman Clyburn did
not disagree with the conclusion reached, stating that he
understood "the conclusion the Board reaches in this
difficult case," but stated the Board "should give more
guidance on how it interprets its own ordering paragraph."

We agree. We note that the new merger rules, updated
June 7, 2001, which Commissioner Burkes had hoped
might help to resolve the Board's interpretation of
representations conditions, fail to provide much assistance
in this respect. The Board characterized the new rule as a
codification of its current practice. It provides that the
Board will oversee parties to a merger for a minimum of five
years, requiring them to present evidence to the Board on
at least an annual basis "to show that . . . the applicants
are adhering to the various representations they made on
the record during the course of their merger proceeding
. . . . During the oversight period, the Board will retain
jurisdiction to impose any additional conditions it
determines are necessary to remedy or offset adverse
consequences of the underlying transaction." Major Rail
Consolidation Procedures, STB Ex Parte No. 582, 2001 STB
LEXIS 546, at *86 (STB June 11, 2001).

Although we recognize this may be an inadequate
response to Vice-Chairman Clyburn's concern and to that
expressed by petitioners in this case, given the limited
review that we have over agency decisions, and particularly

decisions of the Board which has the responsibility over the complex issues that arise with mergers in the troubled state of the railroad industry in this country, we cannot overturn its decision in this case because we conclude it was neither arbitrary nor capricious. We note, however, that a more comprehensive analysis and explanation for the reasons for what appears to be its change of position would have been welcome and might have helped to reconcile the affected parties to the ultimate result.

22

IV.

CONCLUSION

For the reasons set forth we will deny the petition for review. The stay imposed by this court will be lifted.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

23